Davis, Judge,
delivered the opinion of the court:
This is a sibling to The Six Nations v. United States, Appeal No. 8-63 (also decided this day), ante, p. 899, in which the Senecas seek to charge the United States, under the Indian Claims Commission Act, 25 U.S.C. § 70a, for four sales of their New York lands, at allegedly inadequate prices, to private parties. The Indian Claims Commission rejected each of the four claims on the ground that the Federal Government was not responsible for the transactions. 12 Ind. Cl. Comm. 755. We agree as to the first sale in 1788, but reverse as to the later ones in 1797, 1826, and 1838-1842.
The-Senecas’ lands lay in the region disputed by New York and Massachusetts after the Revolution. “Before 1786, Massachusetts and New York claimed, under conflicting royal grants, both sovereignty and title of a large area of what is now western New York. The controversy was settled by the Treaty of Hartford [in December 1786] by which Massachusetts gave up all its claim to sovereignty over the territory, and its claim to private ownership in part of it, and New York ceded to Massachusetts ‘the Bight of preemption of the Soil from the native Indians and all other Estate, Bight, Title and Property (the Right and Title of Government Sovereignty and Jurisdiction excepted) which the State of New York hath * * * in or to all the Lands and Territories’ ” within boundaries containing the Senecas’ lands now in issue. Massachusetts v. New York, 271 U.S. 65, 81 (1926). The treaty also provided that Massachusetts could grant this right of preemption[1] “to any person or persons”, *920 but that any purchase would have to be made in the presence of a representative appointed by Massachusetts and would have to be confirmed by that commonwealth. The four sales in this case were made to private individuals or companies awarded this pre-emptive right by Massachusetts.
I
THE PHELPS AND GORHAM 'PURCHASE (1788)
In 1788, Massachusetts granted its right of preemption, under the Hartford Treaty (or Compact), to Oliver Phelps and Nathaniel Gorham who purchased, in that same year, a large Seneca area of over 2,500,000 acres for $5,000 and an annuity of $500. Massachusetts confirmed the sale but the Federal Government had no part in the trade.
Appellants’ demand for relief as to this sale must be denied for reasons similar to those given, for the purchase by Pennsylvania of the northwestern quadrant of that state, in The Six Nations v. United States, supra.[2] The land involved in this purchase did not ever belong to the United States; the Federal Government did not deal with the Indians; and it had no partnership or concert with Massachusetts (or New York). The central government was, and could properly be, a mere bystander. No fiduciary role was assumed by the Continental Congress, under the Articles of Confederation, with respect to these lands then within state borders. Nor did the Treaty of Fort Stanwyx, 7 Stat. 15 (1784), impose any such fiduciary status or supervisory role on the United States. There was, in sum, ho connection between the United States and the Phelps-Gorham purchase (in 1788) strong enough to evoke application of any of the clauses of Section 2 of the Indian Claims Commission Act. The United States cannot be held accountable, for that bargain.
The outsider’s position of the Federal Government, under the Confederation, toward Indian lands within the states was clearly delineated by President Washington when some of the Seneca chiefs complained, in 1790, of the sale to Phelps *921 and Gorham.[3] At the end of December 1790, the President, in an address to the chiefs, pointed out that the matters about which the Senecas complained “arose before the present Government of the United States was established, when the separate States, and individuals under their authority, undertook to treat with the Indian tribes respecting the sale of their lands. But the case is now entirely altered; the General Government, only, has the power to treat with the Indian nations, and any treaty formed, and held without its authority, will not be binding. * * This address stressed the difference between future sales of the Senecas’ remaining lands and the transactions which had gone before. As to the latter, the Federal Government could offer no more than “the federal courts [which] will be open to you for redress, as to all other persons” (emphasis added).
11
POST-1790 SALES
Being unable to carry out their contract with Massachusetts to pay for the remaining lands, Phelps and Gorham re-conveyed their interest back to the commonwealth which then resold the preemptive rights to Bobert Morris. In 1797, he purchased from the Seneca Nation all their land west of the Phelps-Gorham tract (except for eleven reservations, and a strip along the Niagara River, which were retained). This amounted to some four million acres, for which the Indians received $100,000 (about 2% cents per acre). Thereafter, the Ogden Land Company acquired Massachusetts’s residual *922 rights of preemption and, in 1826, purchased from the Senecas a number of their remaining reservations (about 87,500 acres) for $42,500 (48% cents per acre). In 1838-1842, the Land Company bought two more tracts (62,700 acres) for $75,000 ($1.20 per acre). These three sales (to Morris and the Ogden Land Company) were confirmed by Massachusetts and put into effect. They are the foundation for the remaining claims in the present litigation.[4]
To us the compelling distinction between these three sales and the Phelps-Gorham purchase of 1788 is the adoption in 1790 by the Congress, under the Constitution (which became effective March 4, 1789), of the Trade and Intercourse Act.[5] This statute (which is still on the books as R.S. 2116, 25 U.S.C. § 177) forbade any sale or conveyance of Indian lands without the consent of the Federal Government. There have *923 been different versions of the Act,[6] but the requirement has always been for federal consent and participation in any disposition of Indian real property. From the beginning, this legislation has been interpreted as giving the Federal Government a supervisory role over conveyances by Indians to others, in order to forestall fraud and unfairness. In his speech to the Senecas in December 1790 (mentioned above)— a few months after the enactment of the Trade and Intercourse Act — President Washington said with respect to the disposition of the remaining Seneca lands: “Here, then, is the security for the remainder of your lands. No State, no person, can purchase your lands, unless at some public treaty, held under the authority of the United States. The General Government will never consent to your being defrauded, but it will protect you in all your just rights. * * * But your great object seems to be, the security of your remaining lands; and I have, therefore, upon this point, meant to be sufficiently strong and clear, that, in future, you cannot be defrauded of your lands; that you possess the right to sell, and the right of refusing to sell, your lands; that, therefore, the sale of your lands, in future, will depend entirely upon yourselves. But that, when you may find it for your interest *924 to sell any part of. your lands, the United States must-be present, by their agent, and will he yoitr security that you shall not.he defrauded in the bargain you may make. * * * That, besides the before mentioned security for your land, you will perceive, hy the law of Congress for regulating trade and intercourse with the Indian tribes, the fatherly care the United. States intend to take of the Indians. For the particular meaning of this law, I refer You to the explanations given thereof by Colonel Timothy Pickering, at Tioga, which, with the law, are herewith delivered to you” (emphasis added). American State Papers (Indian Affairs, Vol. I, 1832), p. 142.
Colonel Pickering’s, explanation at Tioga, to which the President referred, mentioned previous frauds practiced by “some white men”, and then said: “Now, Brothers, to prevent these great evils in future, the Congress declare That no sale of lands made by any Indians, to any person or persons, or even to any state, shall be valid (or of force) unless the same be made at some public treaty held under the authority of the United States. For at such public treaty wise and good men will be appointed by the President to attend, to prevent all deception and fraud. . These wise & Good men will examine every deed before it is signed and sealed, and see that evenly lease or purchase of the Indians he openly and fairly made” (emphasis added).
These were the statements, in 1790, by the President and his special representative, shortly after the enactment .Of the Trade and Intercourse Act. They plainly show the Federal Government as thenpeforth the guardian and preserver of fairness to the Indians in their land dispositions. The very same theme is expressed in the most recent authoritative exposition of the Act’s reach. In Federal Power Comm'n v. Tuscarora Indian Nation, 362 U.S. 99, 119 (1960), the Supreme Court said: “The obvious purpose of that statute is to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties, except the. United States, without the consent of Congress, and to enable the Government, acting as parens patriae for the Indians, to vacate any disposition of their lands made *925 without its consent.” Earlier, the Court had said, with specific reference to this trade and intercourse legislation: “Many provisions hayé been enacted by Congress — some general and others special — to prevent the Government’s Indian wards from improvidently disposing of their lands and becoming homeless public charges.” United States v. Candelaria, 271 U.S. 432, 441 (1926). See, also, Alonzo v. United States, 249 F. 2d 189, 194, 196 (C.A. 10, 1957), cert. denied, 355 U.S. 940 (1958).
In the light of its language, contemporaneous construction, and history, we hold that the Trade and Intercourse Act created a special relationship between the Federal Government and those Indians covered by the legislation, with respect to the disposition of their lands, and that the United States assumed a special responsibility to protect and guard against unfair treatment in such transactions. Cf. The Oneida Tribe of Indians v. United States, 165 Ct. Cl. 487 (1964), cert. denied, 379 U.S. 946. This responsibility was not merely to be present at the negotiations or to prevent actual fraud, deception, or duress alone; improvidence, unfairness, the receipt of an unconscionable consideration would likewise be of federal concern. President Washington referred to “all” the Indians’ “just rights” and to “the fatherly cafe the United States intend to take of the Indians.” Colonel Pickering told the Senecas that the Federal Government’s “wise and good men” will “see that every lease or purchase of the Indians be openly and fairly made.” The Supreme Court referred to the prevention of “unfair, improvident or improper disposition by Indians of [their] lands.” . The concept is obviously one of full fiduciary responsibility, not solely of traditional market-place morals. When the Federal Government undertakes an “obligation of trust” toward an Indian tribe or group, as it has in the Intercourse Act, the obligation is “of the highest responsibility and trust,” not that of “a mere contracting party” or a better-business-bureau. Cf. Seminole Nation v. United States, 316 U.S. 286, 296-97 (1942).
It necessarily follows, we think, that wherever this Act *926 applies the United States is liable, under the Indian Claims Commission Act, for the receipt by the Indians of an unconscionably low consideration. It can be said, on the one hand, by invoking clause (3) of Section 2 of the Claims Commission Act, that the sales-agreement must be treated as one between the Indians and the United States (as well as between the Indians and the purchaser) because the Government’s participation and consent was a necessary prerequisite under the Trade and Intercourse Act. Or it can be said (under clause (&)) that the principles of “fair and honorable dealings” require the United States to account for any agreements it sanctioned under the Trade and Intercourse Act without assuring the receipt of a proper and provident consideration. On either theory the United States would be liable, as a fiduciary with special responsibility, for the failure of the vendee to make a conscionable and just exchange.
There is no adequate reason why the Trade and Intercourse Act should be held inapplicable to the three sales of Seneca lands which took place after 1790. The statutory terms amply embrace these transactions and the benign purpose of the Act surely required that it govern agreements of this magnitude and importance to the Senecas. The United States acted, at the time, as if the statute controlled; it sent a representative to each transaction and investigated Indian complaints as to the 1826 sale. Many years ago, the New York Court of Appeals did question (without deciding) whether the Act applied to Hartford Compact land (Seneca Nation v. Christie, 126 N.Y. 122, 142, 27 N.E. 275, 280-81 (1891), writ of error dismissed, 162 U.S. 283 (1896)), but we think that recent holdings and research have dissipated that doubt. Tuscarora Nation of Indians v. Power Authority, 257 F. 2d 885 (C.A. 2, 1958), cert. denied, 358 U.S. 841, appeal dismissed, 362 U.S. 608 (1960); Tuscarora Indian Nation v. Federal Power Commission, 265 F. 2d 338, 339 (C.A.D.C., 1958), rev'd on other grounds, 362 U.S. 99 (1960)[7]; United *927 States v. Forness, 125 F. 2d 928, 932 (C.A. 2, 1942), cert. denied, 316 U.S. 694; Gunther, Governmental Power and New York Indian Lands—A Reassessment of a Persistent Problem of Federal-State Relations, 8 Buffalo L. Rev. 1 (1958); cf. Federal Indian Law (1958), p. 973, 978. Some relatively recent decisions, at war with the circuits’ rulings in the Tuscarora litigation, suggest that the legislation is inapplicable to purchases or condemnations by the State of New York itself, but even these opinions do not purport to exempt private purchases from the Act’s reach. See United States v. Franklin County, 50 F. Supp. 152, 155-56 (N.D.N.Y., 1943); United States v. Cattaraugus County, 71 F. Supp. 413 (W.D.N.Y., 1947); St. Regis Tribe of Mohawk Indians v. State of New York, 5 N.Y. 2d 24, 39-40, 152 N.E. 2d 411, 419 (1958), cert. denied, 359 U.S. 910 (1959). We know of no judicial holding that the Trade and Intercourse Act is inapplicable to sales or dispositions by the New York Indians to private parties.
For these reasons, our conclusion must be that the Indian Claims Commission erred in failing to hold that, through the Trade and Intercourse Act, the United States had a special, a fiduciary, responsibility over these three post-1790 sales by the Senecas to see that a proper, a conscionable, consideration was paid.[8] We do not determine whether or not the purchasers-did pay an unconscionable consideration, as appellants contend — that question deserves further ventilation below [9] — but remand to the Commission to decide the issue, as well as any other which remains in the case. Accordingly, the Commission’s determination is affirmed as to the Phelps and Gorham purchase in 1788, but reversed as to the three later transactions.

Affirmed in part; reversed in part.

 Preemption was the right to purchase the Indians’ title to the land if they were willing to sell. See Worcester v. Georgia, 6 Pet. (31 U.S.) 515, 544 (1832); United States v. Kagama, 118 U.S. 375, 381 (1886).

 The parties have stipulated that the record in The Six Nations forms part of the record in the present proceeding.

 In November 1787 and January 1788, another group (variously called the “New York Genesee Company”, the “Lessee Company”, “Livingston and his associates”) had purported to obtain a 999-year lease, from the Six Nations, of all the New York lands claimed by them. Although New York and Massachusetts both declared these leases invalid, the group persisted in going ahead with its project as to all the leased territory except that assigned to Massachusetts by the Hartford Compact. Accordingly, the Indians expected to receive payment, not only from Phelps and Gorham, but also from the Lessee Company. New York, however, indicted the principal members of the Livingston group and prevented them from making the payments. This led to accusations by the Indians that the Lessee Company had deceived them; and the complaint to Washington included that charge, as well as some dissatisfaction with Phelps and Gorham. It may well be that the Indians did not distinguish between the monies to be paid by the Lessee Company and those coming from Phelps and Gorham, but lumped them all together.

 The Tonawanda Band, co-appellant, is interested only in the two later sales.

 Like the 1784 Treaty of Fort Stanwyx, supra, the Treaty of Canandaigua of November 11, 1794, 7 Stat. 44, did not, in itself, vest any fiduciary responsibility or supervisory role in the Federal Government with respect to a transfer of the Senecas’ lands to others. We agree with the Indian Claims Commission that the purpose of this agreement was to reconfirm peace and friendship between the united States and the Six Nations, to correct an inadvertent error in the boundaries theretofore allotted to the Indians, and to relinquish any rights the United States may have acquired through this error. There was no purpose to divest New York and Massachusetts of their rights, nor was there any purpose to prevent or to supervise sales or transfers of Seneca territory.
Article III of the Treaty, after correctly bounding the Seneca area (so as explicitly to recognize the Phelps and Gorham purchase), provided: “Now, the United States acknowledge all the land within the aforementioned boundaries, to be the property of the Seneka nation; and the United States will never claim the same, nor disturb the Seneka nation, nor any of the Six Nations, or of their Indian friends residing thereon and united with them, in the free use and enjoyment thereof: but it shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase.” Article IV declared that “the United States having thus described and acknowledged what lands belong to the Oneidas, Onondagas, Cayugas, and Senekas, and engaged never to claim the same, nor to disturb them, or any of the Six Nations, or their Indian friends residing thereon and united with them, in the free use and enjoyment thereof," the Indians likewise pledge not to claim and disturb the remaining land within the boundaries of the United States. Whatever may have been the impact of these provisions on compulsory acquisitions by the United States itself, we can find no implication in this exchange that the Federal Government was thereafter to have, under the Treaty, any responsibility for overseeing the Indians’ right to transfers to others — a right which was expressly recognized at the end of Article III.
See, also, Federal Power Comm’n v. Tuscarora Indian Nation, 362 U.S. 99, 121-23, fn. 18 (1960), holding that the conveyance to Robert Morris extinguished all rights under prior treaties, including the Treaty of Canandaigua.

 Section 4 of the Act of July 22, 1790, 1 Stat. 137, 138, provided: “That no sale of lands made by any Indians, or any nation or tribe of Indians within the united States, shall be valid to any person or persons, or to any state, whether having the right of preemption to such lands or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States.” By the Act of March 1, 1793, Sec. 8, 1 Stat. 329, 330, this was amended to read as follows: “That no purchase or grant of lands, or of any title or claim thereto, from any Indians or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the constitution; and it shall be a misdemeanor, in any person not employed under the authority of the United States, in negociating [sic] such treaty or convention, punishable by fine not exceeding one thousand dollars, and imprisonment not exceeding twelve months, directly or indirectly to treat with any such Indians, nation or tribe of Indians, for the title or purchase of any lands by them held, or claimed: Provided nevertheless, That it shall be lawful for the agent or agents of any state, who may be present at any treaty, held with Indians under the authority of the United States, in the presence, and with the approbation of the commissioner or commissioners of the United States, appointed to hold the same, to propose to and adjust with the Indians, the compensation to be made for their claims to lands within such state, which shall be extinguished by the treaty.” This version was carried forward, with slight changes, into the Act of May 19, 1796, Sec. 12, 1 Stat. 469, 472; the Act of March 3, 1799, Sec. 12, 1 Stat. 743, 746; the Act of March 30, 1802, Sec. 12, 2 Stat. 139, 143; the Act of June 30, 1834, Sec. 12, 4 Stat. 729, 730; and R.S. 2116, now 25 U.S.C. § 177.

 In its Tuscarora opinion, tlie Supreme Court did not cast doubt on the applicability of the Trade and Intercourse Act to Iriquois lands in New York. The Court held only that the Act did not coyer condemnations by, or under the authority of, the Federal Government.

 Because of this disposition, it is unnecessary, at least at the present stage, to pass upon the appellants’ contentions that the Federal Government also failed in other respects to live up to its fiduciary responsibility of fair and honorable dealings with respect to the three transactions. These other issues may drop out of the case. If they retain importance, the Commission should reconsider them in the light of our opinion in this and the companion cases.

 We note, however, that in determining whether an unconscionable or inadequate consideration was paid, it is normally immaterial that the Indians may not have protested the price at the time or thereafter.