Joseph FLUENT, et al., Plaintiffs,

v.

**SALAMANCA INDIAN LEASE AUTHORITY, et al.,**
Defendants.

No. 90–CV–1229A.

United States District Court,
W.D. New York.

March 14, 1994.

Jennifer A. Coleman, Buffalo, for plaintiffs.

R. William Stephens, Raichle, Banning, Weiss & Stephens, Buffalo, for defendants.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Heckman on February 10, 1993, pursuant to 28 U.S.C. § 636(b)(1). On July 27, 1993, Magistrate Judge Heckman filed a Report and Recommendation recommending that the District Court grant defendants' motion for summary judgment, dismiss the second, third, fifth, seventh, ninth, eleventh and twelfth causes of action, and enter judgment on the complaint in favor of defendants as a matter of law.

Plaintiffs filed objections to the Report and Recommendation on September 10, 1993. Defendants filed a response to plaintiffs' objections on October 22, 1993. Oral argument on plaintiffs' objections was heard on November 10, 1993.

At oral argument, plaintiffs argued that numerous issues of fact exist which prevent the Court from granting defendants' summary judgment motion. As evidence of the factual issues in dispute, plaintiff referenced transcripts of negotiations between the Salamanca Indian Lease Authority and the Seneca Nation. Item No. 75. The Court directed plaintiffs to submit a copy of the transcripts with the material plaintiffs wished to emphasize highlighted for easier reference by the Court.

Plaintiff submitted the highlighted material on November 29, 1993. Defendants submitted a response to the submission on December 8, 1993. Upon review, the Court finds that the supplemental material fails to demonstrate that any material issue of fact exists such that defendant's summary judgment motion should be denied.

Pursuant to 28 U.S.C. § 636(b)(1), the Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Heckman's Report and Recommendation, defendants' motion for summary judgment is granted. Plaintiffs' second, third, fifth, seventh, ninth, eleventh and twelfth causes of action are dismissed. The Clerk is directed to enter judgment for defendants as a matter of law.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

HECKMAN, United States Magistrate Judge.

Pending before the court is Defendants' motion to dismiss and/or for summary judgment. Pursuant to 28 U.S.C. 636(b)(1)(B), this motion was referred to the undersigned to hear and report. For the reasons set forth below, Defendants' motion should be granted.

### PROCEDURAL HISTORY

Plaintiffs Salamanca Coalition of United Taxpayers, Inc. ("SCOUT"), representing nearly 600 lessees, and five individual lessees, commenced this action in November of 1990 against the Seneca Nation of Indians ("Nation"), and against the Salamanca Indian Lease Authority ("SILA"), the City of Salamanca and various City officials to compel the Nation to renew their leases for up to 99 years. Other relief was sought, including a declaration that the agreement negotiated by SILA, the City and the Nation for renewal of the leases was null and void.

Plaintiffs moved for a temporary restraining order and preliminary injunction against SILA and its members seeking to prevent SILA's future operation and any future use by SILA of City funds and resources. On January 8, 1991, this motion was denied by the District Court. On January 25, 1991, the District Court dismissed all claims against the Nation, finding that the Nation was immune from suit. It also dismissed the first, eighth and tenth causes of action against the remaining Defendants on the ground that an adjudication of those claims in the absence of

the Nation would impede the Nation's ability to protect its interest in the subject of those claims. On March 18, 1991, the District Court's decision was upheld by the Second Circuit. *Fluent v. Salamanca Indian Lease Authority,* 928 F.2d 542 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 74, 116 L.Ed.2d 48 (1991).

On October 25, 1991, Defendants moved to dismiss or for summary judgment as to the remaining claims in the complaint. This motion was referred to the undersigned to hear and report on February 10, 1993. Argument on the motion was scheduled for April 27, 1993 but was subsequently adjourned with the consent of counsel until May 13, 1993. On May 13, oral argument was held and the parties were requested to file supplemental papers addressing certain issues which came up during oral argument. This supplemental briefing was completed by June 15, 1993.[1]

### FACTUAL BACKGROUND

The dispute giving rise to this action has been thoroughly described in the Second Circuit's opinion of March 15, 1991, as well as in the District Court's orders of January 8 and January 25, 1991.

During the mid-nineteenth century, the Nation leased tribal lands within the City and outlying villages, known as the Congressional Villages, to settlers and railroads. These leases were validated by Congress in the Act of February 19, 1875, ch. 90, 18 Stat. 330 ("1875 Act"). The leases were renewed in 1880 for a 12–year term, and again in 1892 for a 99–year term under the Act of September 30, 1890, ch. 1132, 26 Stat. 558 ("1890 Act"). This action arises from the dispute which has developed concerning the renewal

of these 99–year leases, all of which expired on February 19, 1991.[2]

In 1969, the New York State legislature enacted sections 1790–99 of the Public Authorities Law. This statute created SILA as a public benefit corporation authorized to negotiate and enter into a "master lease" with the Nation for all reservation lands underlying the City. N.Y.Pub.Auth.Law §§ 1791(e), 1794. During the latter course of nearly twenty years of lease negotiations between SILA and the Nation, the "master lease" concept was rejected (Item 1, ¶¶ 62–63 & Exh. F, p. 2).

SILA then sought and received authorization from an overwhelming majority of lessees "to negotiate with the [Nation] and its legally authorized representatives for the terms and provisions of a renewal of" their leases (Item 1, Exh. G). By letter dated September 3, 1987 (Item 1, Exh. 1), SILA notified the lessees as follows:

> By virtue of an Act of Congress in 1875, all so-called "99–year leases" are renewable at the option of the lessee. The key word here is "option." The lease is not automatically renewable—you must exercise the option or right to renew and you must negotiate for the terms of such renewal.... It is not the intention of the [SILA] to sign or execute a renewal lease on your behalf, but merely to negotiate such lease. It will be your decision to either sign or not sign the leases so negotiated for you by the [SILA].

The authorization form contained an express provision that SILA "shall have no authority to execute or accept such a renewal lease for [the lessee] without [the lessee's] specific written authority" (Item 1, Exh. G).

---

1. Defendants have submitted a Statement of Material Facts Not in Issue, in accordance with Rule 25 of the Local Rules for the Western District of New York. Plaintiffs have not complied with this rule. However, the briefs, affidavits and exhibits on file, along with matters presented during oral argument, have provided the court with sufficient information regarding the material facts as to which it is contended that there exists a genuine issue to be tried so as to enable the court to proceed with this motion for summary judgment.

2. The legislative history of H.R. 5367, which Congress enacted as the Seneca Nation Settlement Act of 1990, Pub.L. 101–503, 104 Stat. 1292, states as follows:

> [T]he rental terms of the current leases are grossly unfair. Some tenants pay as little as $1.00 per year for their land lease. The average annual fee has been reported at $10.00 per lease. For most of the leases, the rental fees have been in effect since a master lease was negotiated under the terms of the 1890 Act....

H.R.Rep. No. 832, 101st Cong., 2d Sess.1990, 1990 WL 200558 (Leg.Hist.), *8.

By letter dated May 21, 1990, SILA notified lessees that the lease negotiations had concluded, and enclosed a "Question and Answer" fact sheet in an attempt to address "many anticipated questions of lessees" (Item 1, Exh. F). Among the questions and answers was the following:

Q. If I do not like the negotiated terms, what can I do?

A. The [SILA] has no legal ability to bind the lessees to any term, condition or amount of annual lease rental payment. The [SILA] is only capable of negotiating for all the provisions to be contained in a new lease for the lessees. As an individual lessee you do have the right to accept or reject the new lease or to negotiate your own terms with the Seneca Nation.

In mid-July of 1990, the City and the Nation signed a renewal agreement (the "Agreement"), which offered lessees new leases for a term of 40 years, with the right to renew for an additional 40 years ("40/40 leases") (Item 1, Exh. G). Annual rents were based on the fair market value of the land, without improvements.

The Agreement established the total annual rental at $800,000.00, to be collected and paid by the City, subject to adjustment based on yearly reappraisal of land values (*id.*). One of the conditions of the Agreement was payment by the federal and state governments of sums approximating the difference between the fair market rental value of the land and the rents actually received by the Nation over the past 99 years. Congress subsequently enacted the Seneca Nation Settlement Act of 1990, 25 U.S.C. §§ 1774–1774h (the "1990 Act"), in which it validated the Agreement between the Nation and the City and agreed to pay the Nation approximately $35 million. In July, 1991, New York passed legislation in which it agreed to pay $25 million. 1991 N.Y.Laws ch. 528.

On September 4, 1990, the Nation sent a copy of the 40/40 lease to each lessee, with instructions on how to verify a claim to a leasehold interest and other information (Item 1, Exh. N). In that letter, the Nation stated that "[t]he terms of the new lease have been agreed upon by the Nation and the City.... They will not be altered" (*id.*).

On November 2, 1990, approximately 350–400 lessees notified the Nation that they were electing to renew their leases for an additional 99–year term, purportedly relying on provisions in the 1875 and 1890 Acts (Item 1, Exh. C). The form notification letter used by these lessees stated: "This letter constitutes neither an acceptance nor rejection of [the] proposed 40/40 lease agreement and it is my understanding that my option to execute that lease agreement continues through and including February 19, 1991" (*id.*).

On the same day, approximately 300–350 lessees notified SILA that they each were cancelling their authorization for SILA to negotiate with the Nation on their behalf (Item 1, Exh. O).

On November 9, 1990, the Nation refused to renew the leases for additional 99–year terms. According to the Nation, the 40/40 lease proposed in the 1990 Agreement represented a "compromise offer." The Nation advised the lessees that it would consider any litigation, request for arbitration, or continued assertion of a right to a renewed 99–year lease as a rejection of the proposed 40/40 lease (Item 1, Exh. D).

On November 14, 1990, SILA acknowledged receipt of the revocation letters, stating that:

The consent which you executed to the SILA and which you now request to withdraw has already been exercised by the SILA inasmuch as the negotiations which the consent authorized have long since been concluded—a fact of which we are sure you are aware.

The SILA will attribute some purposeful reason to your withdrawal of such consent, to wit:

1. That the SILA is not authorized to conduct any further lease negotiations on your behalf.

2. That you have anticipatively [sic] rejected the new proposed lease and consequently your name will be removed from the roll of those entitled to acquire a new lease as the same has been proposed. In furtherance of this interpretation of your letter we have, on this date, advised the

[Nation] of your rejection of the newly proposed lease and requested the [Nation] to remove your name from the list of those entitled to a newly proposed lease.

Item 1, Exh. P.

On November 15, 1990, counsel for Plaintiffs wrote to the City and the Nation objecting to SILA's interpretation of the individual lessees' revocation of SILA's authority as a rejection of the proposed 40/40 lease, and asking the Nation to disregard that interpretation (Item 1, Exh. R). In a letter dated November 21, 1990 (Item 1, Exh. Q), Calvin John, President of the Seneca Nation of Indians, responded to counsel's request as follows:

Because your letter does not identify any client or person on whose behalf you are writing, the Nation will not respond to your characterization of actions taken by our lessees. The Nation has previously explained that it will deal only with lessees who have proven their right to renew pre-existing leases, or with their duly authorized agents and legal representative, including of course the [SILA].... The Nation is now in the process of: (1) reviewing the cancellations of authorizations which the City has now transmitted to the Nation; (2) reviewing the [SILA]'s response to these cancellations, and (3) identifying which of the lessees who wrote to the Nation have also cancelled their authorization. The Nation will consider what further action to take when that review is concluded.

Meanwhile, on November 19, 1990, Plaintiffs' counsel met with representatives of SILA and the City. In a letter to Mayor Carbone dated November 20, 1990, Plaintiffs' counsel confirmed Plaintiffs' position that, having concluded its negotiations with the Nation, SILA no longer had any authority for its continued existence. The stated purpose of the letter was to put SILA and its individual members on notice that they would be held "responsible for any economic or other damage caused by SILA to any individual lessee with respect to any conduct which SILA has engaged in the past or may in the future engage in" (Item 1, Exh. S). Counsel also discussed the apparent conflict arising from City Attorney David Franz's legal representation of both the City and SILA (*id.*).

On November 30, 1990, Plaintiffs filed this action, asserting twelve separate causes of action for injunctive and monetary relief under various theories of federal and state law. Plaintiffs allege federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) for claims arising under the Acts of 1875 and 1890, the federal Non–Intercourse Act, the First and Fourteenth Amendments, and 42 U.S.C. § 1983.

The parties agree that the claims asserted in the first, fourth, sixth, eighth and tenth causes of action have been dismissed from the case or are moot. Defendants now move for summary judgment or dismissal of the remaining claims in the complaint. Each of those claims will be discussed in turn below.

## DISCUSSION

### Second Claim

The second claim alleges that New York's Public Authorities Law, which established SILA, is unconstitutional as a matter of law. According to Plaintiffs, the state's establishment of a public authority to negotiate a master lease with the Nation was precluded by the federal Non–Intercourse Act, 25 U.S.C. § 177, which prohibited conveyance of Indian lands in the absence of treaty or convention. Plaintiffs also assert that the establishment of SILA violates Article 1, § 8 of the Constitution, which provides that "... Congress shall have the Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes...."

Defendants have moved for summary judgment dismissing the second claim pursuant to Rule 56 of the Federal Rules of Civil Procedure on the ground that Plaintiffs have failed to demonstrate that the Non–Intercourse Act applies to the leases at issue or that §§ 1790–99 of the Public Authorities Law is otherwise unconstitutional.

Summary judgment is appropriate if the pleadings, discovery materials, and affidavits on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." Fed.R.Civ.P. 56(c). In reaching this determination, the court must assess whether there are any material actual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166–67 (2d Cir.1991). In order to avoid summary judgment, however, the nonmoving party is under the obligation "to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Burke v. Bevona*, 931 F.2d 998, 1001 (2d Cir.1991). "Entry of summary judgment indicates that no reasonable jury could return a verdict for the losing party." *Coach Leatherware, Inc. v. AnnTaylor, Inc., supra,* 933 F.2d at 167.

### A. The Non–Intercourse Act.

■ The federal Non–Intercourse Act provides in pertinent part as follows:

No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. . . .

25 U.S.C. § 177. This section was originally enacted as § 4 of the Act of July 22, 1790, 1 Stat. 138, and was amended by § 8 of the Act of March 1, 1793, 1 Stat. 330, to read substantially the same. This version was carried forward, with slight changes, into § 12 of the Act of May 19, 1796, 1 Stat. 472; § 12 of the Act of March 3, 1799, 1 Stat. 746; § 12 of the Act of March 30, 1802, 2 Stat. 143; § 12 of the Act of June 30, 1834, 4 Stat. 730; and the current version. *See Seneca Nation of Indians v. United States*, 173 Ct.Cl. 917, 923 n. 6, 1965 WL 8343 (U.S.1965). The overriding purpose of this Act is the protection of Indian lands from unauthorized alienation or misuse. *United States v. University of New Mexico*, 731 F.2d 703, 706 (10th Cir.), *cert. denied*, 469 U.S. 853, 105 S.Ct. 177, 83 L.Ed.2d 111 (1984).

However, several statutory enactments by Congress have long since authorized the Nation to negotiate for the leasing of its land without the need for formal treaty or convention, thereby "taking Seneca leasing out of 25 U.S.C. § 177. . . ." *United States v. Devonian Gas and Oil Co.*, 424 F.2d 464, 467 n. 3 (2d Cir.1970). First, the 1875 Act expressly allowed for leases of Seneca Nation land within the Cattaraugus and Allegany reservations, making those leases then existing "valid and binding upon the parties thereto" for a five-year period, renewable for periods not exceeding twelve years. Act of February 19, 1875, ch. 90, 18 Stat. 330, § 3. Next, the 1890 Act made those leases "renewable for a term not exceeding ninety-nine years, instead of the term of twelve years. . . ." Act of September 30, 1890, ch. 1132, 26 Stat. 558.

Congress also enacted the Seneca Leasing Act of 1950 (the "1950 Act"), which provided as follows:

In addition to the authority now conferred by law on the [Nation] to lease lands within the Cattaraugus, Allegany, and Oil Springs Reservations to railroads and to lease lands within the limits of the villages established under authority of the [1875 Act], the [Nation], through its council, is authorized to lease lands within the Cattaraugus, Allegany, and Oil Springs Reservations, outside the limits of such villages, for such purposes and such periods as may be permitted by the laws of the State of New York.

64 Stat. 442, ch. 707, § 5.

The clear purpose of these statutes was to allow the Nation to lease its land without concern for the strictures of the "treaty or convention" requirements of the Non–Intercourse Act. A further purpose was to allow for some amount of oversight of the leasing process by the State of New York. These purposes were confirmed in *United States v. Devonian Gas and Oil Co., supra.* There, the federal government sought to condemn land on the Allegany reservation, owned by the Nation and subject to mineral rights leases, for the Allegany River Reservoir project. The government contended that the leases were invalid under § 5 of the 1950 Act, which by its language required specific

leasing permission from the New York State legislature.

The Second Circuit disagreed, finding that the purpose of the 1950 Act was to expand, rather than to restrict, the Nation's authority to lease its land, although not to such a degree as to put the Nation in a better position than other New York citizens. 424 F.2d at 470. In other words, the court found that the statute allowed for sufficient control by New York over the Nation's leasing activities so as to ensure that those activities are conducted in accordance with New York law, rather than requiring specific legislative implementation by New York. *Id.* at 471. Thus, by withdrawing federal control over the Nation's leasing activities, and allowing state control, Congress was "taking Seneca leasing out of 25 U.S.C. § 177...." *Id.* at 467 n. 3.

Plaintiffs argue that the *Devonian* case does not support Defendants' motion since that case dealt only with leasing *outside* the City of Salamanca and the Congressional Villages, as authorized by § 5 of the 1950 Act. While it is true that the Second Circuit in *Devonian* was primarily concerned with interpreting § 5 insofar as it concerned leasing outside the City and Congressional Villages, the discussion in that case, as well as the express language of § 5, indicate that, in enacting the 1950 Act, Congress was granting the Nation the same authority to lease reservation lands outside the City and Villages, unhindered by the strictures of the Non–Intercourse Act, as it had previously granted under the 1875 and 1890 Acts to lease its lands *within* the City and Villages.

Further, the 1990 Act recognized the validity of the Agreement reached between the Nation and the City. For example, the 1990 Act provides (emphasis added):

> The Federal and State governments have agreed that there is a moral responsibility on the part of both governments to help secure a fair and equitable settlement for past inequities. 25 U.S.C. § 1774(a)(6).

> \* \* \* \* \* \*

> It is the purpose of this Act ... to effectuate and support the Agreement between the city and the Seneca Nation, and facili-tate the negotiation of new leases with lessees in the congressional villages.... 25 U.S.C. § 1774(b)(1).

> \* \* \* \* \* \*

> *The Congress finds that the Seneca Nation is solely responsible for negotiation of the leases under the Agreement in its own interest and approval of any such lease by the United States is not required.* 25 U.S.C. § 1774c(a).

> \* \* \* \* \* \*

> [N]othing in this subchapter shall be construed to prevent the lessees from collectively negotiating with the Seneca Nation regarding such leases, whether through informal groups or as delegations formally sanctioned by either the State or local governments. 25 U.S.C. § 1774c(b)(2).

> \* \* \* \* \* \*

> The State shall not serve in a capacity to approve leases of the Seneca Nation. 25 U.S.C. § 1774c(d)(1).

█ As a general principle of statutory construction, where the language in one statute conflicts with language in a previously or subsequently enacted statute, the statute that addresses the matter under consideration in specific terms controls over one that does so in a general manner, unless Congress has manifested a clear intent to the contrary. *American Land Title Ass'n v. Clarke*, 968 F.2d 150, 157 (2d Cir.1992), *cert. denied,* ── U.S. ──, 113 S.Ct. 2959, 125 L.Ed.2d 660 (1993). Applying this principle to the statutory enactments at issue here, it is apparent that the Acts of 1875, 1890, 1950 and 1990 specifically address and progressively recognize the authority of the Seneca Nation to lease its land without Congressional approval, as well as the power of the state to delegate authority to collectively negotiate or renegotiate such leases. The specific terms of these statutes therefore control over the more general terms of the previously-enacted Non–Intercourse Act, which broadly addresses the alienation of *all* Indian lands.

As this discussion makes clear, the Non–Intercourse Act did not supersede or preclude the authority granted to SILA by New York's Public Authority Law §§ 1790–99 to

facilitate the negotiation or renegotiation of leases with the Nation. Accordingly, the state statute cannot be found unconstitutional or otherwise invalid on that basis.

### B. Article 1, § 8 of the Constitution.

Without citing any specific constitutional provisions, Plaintiffs' complaint alleges that the New York Public Authorities Law is "null and void ... since it purports to be an exercise of power by the State of New York in an area of jurisdiction and power reserved exclusively to the United States of America and the United States Congress." Item 1, ¶ 57. In their brief in opposition to the summary judgment motion, Plaintiffs cite Article 1, § 8 of the Constitution, which provides that "... Congress shall have the Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes...."

■ State legislative enactments are entitled to a presumption of constitutionality. *South Carolina State Highway Dept. v. Barnwell,* 303 U.S. 177, 191–92, 195, 58 S.Ct. 510, 517, 519, 82 L.Ed. 734 (1938). This presumption can only be overcome by a clear showing that the statute "transgresses constitutional limitations." *National Mutual Ins. Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 604, 69 S.Ct. 1173, 1183–84, 93 L.Ed. 1556 (1949); *see also Fitts v. Kolb,* 779 F.Supp. 1502, 1513 (D.S.C.1991). The burden is on the party challenging the constitutionality of a statute to demonstrate beyond a reasonable doubt that the act violates the constitutional provision invoked, and to point out with particularity the details of the alleged invalidity. *Patel v. Fleur de Lis Motor Inns, Inc.,* 771 F.Supp. 961, 968 (S.D.Iowa 1991).

To sustain this burden, Plaintiffs "must negative every reasonable basis which would support the statute. Every reasonable doubt is resolved in favor of constitutionality." *Id.* (quoting *City of Waterloo v. Selden,* 251 N.W.2d 506, 508 (Iowa 1977)); *see also Madden v. Commonwealth of Kentucky,* 309 U.S. 83, 87, 60 S.Ct. 406, 407–08, 84 L.Ed. 590 (1940).

■ Plaintiffs have failed to meet this heavy burden. Plaintiffs simply cite the constitutional provision granting Congress the power to regulate commerce with Indian nations, without pointing to any particular infirmities other than the allegation already rejected in this report that the Non–Intercourse Act supersedes any attempts by the state to enact legislation affecting alienation of Indian Lands. In light of the discussion above, and the express language in the congressional Acts of 1875, 1890, 1950 and 1990, such an allegation is untenable, and does not provide a rational basis for a finding of unconstitutionality.

Moreover, there is an articulable rational basis for the establishment of SILA, as set forth at § 1794(j), "to do all things necessary to make the lease between the authority and the [Nation] useful and productive." This comports with the several stated purposes of the 1990 Act "to provide a productive environment between the [Nation] and the lessees for negotiating the leases provided for under the Agreement (25 U.S.C. § 1774(b)(3)); to provide stability and security to the city and the congressional villages, their residents, and businesses (25 U.S.C. § 1774(b)(4)); to promote the economic growth of the city and the congressional villages (25 U.S.C. § 1774(b)(5)); to promote economic self-sufficiency for the [Nation] and its members (25 U.S.C. § 1774(b)(6)); [and] to promote cooperative economic and community development efforts on the part of the [Nation] and the city ..." (25 U.S.C. § 1774(b)(7)).

Plaintiffs have therefore failed to make any showing as to how the state legislature's authorization of SILA is unconstitutional or nullified by any previously-or subsequently-enacted federal statute, essential elements of the grounds for relief stated in the second claim. Plaintiffs have also failed to demonstrate how any further discovery would enable them to make such a showing. In the absence of any genuine issue of material fact regarding the constitutionality or continued validity of the state statute authorizing the establishment of SILA, summary judgment in favor of Defendants is appropriate on the second claim.

### Third Claim

In the third claim, Plaintiffs allege that the acts of SILA prior to obtaining authorizations from the individual lessees in 1987 were unlawful because they were based on an unconstitutional grant of authority under the New York Public Authorities Law. Plaintiffs agree that this argument turns on the same issue raised by the second claim—i.e. whether New York's Public Authorities Law violates the U.S. Constitution or federal law. As discussed above, Public Authorities Law §§ 1790–99 is not unconstitutional or superseded by federal law, and Plaintiffs have failed to present a genuine issue of material fact as to how SILA's acts were otherwise unlawful.

Accordingly, the third claim should be dismissed as a matter of law for failure to state a claim upon which relief can be granted.

### Fifth Claim

Plaintiffs claim that SILA's expenditure of City funds to conduct its operations constitutes waste and conversion in violation of state and federal law. This claim likewise depends on the allegations in the second claim regarding SILA's constitutional or statutory validity. Since, as discussed above, there is no genuine issue of material fact precluding summary judgment in favor of Defendants on the second claim, the fifth claim should be dismissed as well.

■ Moreover, § 1794(f) of the Public Authorities Law expressly authorizes SILA to "[a]ccept gifts, grants or contributions from any municipal corporation or governmental agency or public utility and to expend the proceeds thereof for authority purposes." Because Plaintiffs have not shown how SILA's statutory authority is unconstitutional, this express authorization for expenditure of municipal funds negates any "waste" or "conversion" claims under federal law. At most, Plaintiffs are left with state law tort claims. Since it is recommended that the District Court dismiss the claims over which it has original jurisdiction, the District Court should decline to exercise supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(c)(3). *Hotel Syracuse, Inc. v.*

*Young,* 805 F.Supp. 1073, 1086 (N.D.N.Y. 1992).

■ Plaintiffs further argue that, since they only granted SILA the authorization to negotiate a "renewal" of their previous leases, and not to enter an agreement allowing for new leases, SILA's expenditure of municipal funds was unauthorized. However, in its affirmance of the District Court's dismissal of the claims against the Nation on the grounds of sovereign immunity, the Second Circuit stated:

> Even assuming we were to agree with [Plaintiffs'] contention that the 1875 Act unmistakably and clearly waives the immunity of the Nation, we would affirm the district court's judgment on the ground that the renewal provisions of [the] 1875 Act applied only to the original renewals and do not extend to the present renewals.... The 1875 Act does not authorize a perpetual renewal, and without clear language to that effect, we will not construe the statute to confer such a right.

*Fluent v. Salamanca Indian Lease Authority, supra,* 928 F.2d at 546. It is therefore apparent that SILA never had the authority to negotiate "renewals" of the previous leases under the terms desired by Plaintiffs. Indeed, the purpose of the negotiations between the Nation and SILA, as well as the purpose of the 1990 Act, was to avoid and to compensate the Nation as fully as possible for the inequities of the previous leases.

For these reasons, it is recommended that the fifth claim, insofar as it purports to allege a federal claim, be dismissed as a matter of law for failure to state a claim upon which relief can be granted. Insofar as it states a state claim, the fifth cause of action should be dismissed for lack of supplemental jurisdiction.

### Seventh Claim

The seventh claim challenges actions of SILA. Specifically, Plaintiffs claim that the November 14, 1990 letter from SILA to the Nation purporting to reject the 40/40 lease proposal on behalf of lessees who had revoked SILA's authority constituted breach of contract, breach of fiduciary duty, "a totally unauthorized, unconstitutional and illegal

act" (Item 1, ¶ 114), and retaliation against lessees who disapproved SILA's actions. Plaintiffs also claim that SILA refused to provide information about the lease negotiations to the lessees. According to Plaintiffs, these activities constitute "violation" of unidentified "state and federal law" (Item 1, ¶ 136).

Plaintiffs characterize this claim as both a civil rights claim under 42 U.S.C. § 1983 and a direct constitutional claim under the fourteenth amendment. Plaintiffs also argue that this claim states a first amendment violation for retaliation against Plaintiffs.

■ Relief under 42 U.S.C. § 1983 is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or federal statutory right and, second, that such denial was effected under color of state law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986). Defendants dispute that the conduct complained of on the part of SILA and its officials amounted to state action or occurred under color of state law for the purposes of this lawsuit. Defendants also contest whether the conduct alleged resulted in a denial of Plaintiffs' rights to substantive or procedural due process under the fourteenth amendment, freedom of speech under the first amendment, or some other denial of a federal constitutional or statutory right.

■ The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right "secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692–93, 61 L.Ed.2d 433 (1979). A suit under § 1983 "does not automatically convert potential contract and tort liability under state law into contract and tort liability under federal law whenever the defendant is the state" or is alleged to be acting under color of state law. *Stewart v. Hunt,* 598 F.Supp. 1342, 1353 (E.D.N.C. 1984); *see also Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985) (violation of state law not cognizable under § 1983); *Powers v. Coe,* 728 F.2d 97, 105 (2d Cir.1984) (violations of

state law alone insufficient to state § 1983 claim). Section 1983 imposes liability for violations of rights protected by the constitution and laws of the *United States,* not for violations arising solely out of state or common-law principles. *Stewart v. Hunt, supra,* 598 F.Supp. at 1353. Thus, while some official conduct may clearly violate state law, it may not rise to the level of constitutional injury. The proper remedy in those instances is a suit in state court under traditional contract, tort, agency or other common-law theory. *Id.; Baker v. McCollan, supra,* 443 U.S. at 146, 99 S.Ct. at 2695–96.

■ It is clear from reviewing this claim that the various wrongs alleged constitute, at most, state law violations. Nowhere in the seventh count is any federal constitutional or 1983 claim described. Nor does the claim identify any constitutionally protected interest. The conduct complained of, and the resulting harm, is insufficient to "raise an ordinary tort by a government agent to the stature of a violation of the constitution." *Williams v. Kelley,* 624 F.2d 695, 697 (5th Cir.1980), *cert. denied,* 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391 (1981). Accordingly, this claim, like the fifth claim, should be dismissed insofar as it purports to state a federal claim.

As far as SILA's authority to continue to act after the master lease concept was rejected, this has already been discussed in previous sections and need not be repeated here. As far as the alleged retaliation relating to SILA's November 14, 1990 letter to the Nation purporting to reject the 40/40 lease for those lessees who revoked their authorizations to SILA, the record shows that the Nation did not follow SILA's recommendation. The Nation has not treated any individual revocation of SILA's authority as a withdrawal of the proposed lease. *See, e.g.,* Item I, Exh. Q; Joint Appendix 265–66. Accordingly, there has been no harm resulting from the alleged retaliation. In the absence of any injury, there can be no claim. *Valley Forge College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700

(1982); *Lamont v. Woods,* 948 F.2d 825, 829 (2d Cir.1991).

### Ninth Claim

Plaintiffs claim that the City and Defendant Carbone have violated their constitutional rights by permitting SILA to use City funds and by permitting SILA "to control all aspects of the lease negotiations with" the Nation (Item 1, ¶ 146). For the reasons already discussed, this conduct does not give rise to a federal claim against SILA. *A fortiori,* it cannot give rise to a federal claim against the City and Defendant Carbone based on the same conduct. Accordingly, the ninth claim should be dismissed insofar as it purports to state a federal claim.

### Eleventh Claim

■ Plaintiffs claim that Defendant Franz breached his duty of representation to Plaintiffs by, among other things, acting in a dual capacity as attorney for the City and for SILA and by advising his clients incorrectly as to the constitutionality of their actions. Plaintiffs also allege that Franz participated in the retaliatory action against the lessees. For the same reasons discussed above finding no federal claim against SILA or the City for the alleged constitutional violations, the eleventh claim should be dismissed insofar as it purports to state a federal claim.

### Twelfth Cause of Action

Plaintiffs claim that the individual SILA members continued to act as SILA despite their lack of authority to do so, and wrongfully attempted to reject the 40/40 lease on behalf of the revoking lessees, in violation of Plaintiffs' constitutional rights. For the same reasons set forth above finding no constitutional violation caused by SILA's conduct, it is recommended that summary judgment be entered in favor of Defendants dismissing the twelfth cause of action as a matter of law.

### Additional Claims Not Appearing in the Pleadings

At oral argument of this motion, and in supplemental submissions following oral argument, Plaintiffs raise several new claims which do not appear in the pleadings. First, Plaintiffs argue that they had a right to negotiate directly with the Nation under the 1990 Act and that SILA, in conspiracy with the Nation, denied them that right. Second, Plaintiffs claim that SILA has interfered with their interest in the continued occupancy of their homes and business, and their ownership of leasehold improvements. Finally, Plaintiffs argue that the Nation and SILA conspired to compel the lessees to accept the 40/40 lease, which was prejudicial to Plaintiffs' property interests.

■ These claims are an effort to revive a complaint which was effectively extinguished by (1) the dismissal of the Nation from the case on the ground of sovereign immunity, and (2) the holding that the 99–year leases were not renewable. Since these claims are outside of the pleadings, they cannot provide a basis for continuing the complaint. *See, e.g., Strauss v. City of Chicago,* 760 F.2d 765, 768 (7th Cir.1985) (complaint, even liberally construed, failed to set forth grounds upon which § 1983 claim was based); 2A *Moore's Federal Practice* ¶ 12.-07[2.–5]. But even if these claims were in the complaint, they would not survive this motion. Each shall be discussed in turn.

### A. Plaintiffs "right to negotiate"

Plaintiffs argue that the Nation has an obligation to negotiate with individual lessees and that SILA interfered with that obligation. Plaintiffs further argue that this claim amounts to a *constitutional* violation cognizable under 42 U.S.C. § 1983.

■ Even if this claim were alleged in the complaint, it would not survive Defendants' motion to dismiss or for summary judgment. Absent some contract, or statute to the contrary, Plaintiffs have no constitutional "right to negotiate" with the Nation. The Nation can choose to negotiate with no one, or anyone.

As far as statutory obligations to negotiate, the Act of 1875 and the Act of 1890 give the lessees the right to negotiate a lease in accordance with the terms set forth in these Acts. But the Second Circuit has determined that no further renewals are available. *Fluent v. Salamanca Indian Lease Authority, supra,* 928 F.2d at 546.

As far as a contractual obligation to negotiate, the Second Circuit also determined that the leases did not provide for renewal:

Nor do the terms of the expired leases provide that the Nation must accede to the appellants proposals for renewal.

*Id.* at 547.

The only other possible source of a "right" or obligation "to negotiate" is in the 1990 Act. However, the 1990 Act expressly endorses the 40/40 Agreement, and does not create any right to negotiate a different lease arrangement. The 1990 Act states only that the Nation "is solely responsible for negotiation of the leases *under the Agreement* in its own interest and approval of any such lease by the United States is not required." 25 U.S.C. § 1774c(a) (emphasis added). "The Agreement" is defined as "the document executed by the Seneca Nation and the city entitled 'Agreement between the Seneca Nation of Indians and the City of Salamanca'. . . ." 25 U.S.C. § 1774a(2).

■ Contrary to Plaintiffs' argument, the 1990 Act does not place any obligation on the Nation to negotiate new or renewed lease terms with individual lessees, other than the 40/40 lease referred to as the "Agreement." The 1990 Act simply states that the Nation, acting on its own, is responsible for obtaining 40/40 leases from the individual lessees and need not obtain Congressional approval. Nothing in the statute places a duty on the Nation to negotiate *any* lease arrangement other than the 40/40 lease approved by Congress, the City and SILA.

The 1990 Act also provides as follows:

The Congress finds that—

(1) the lessees of leases with the Seneca Nation are responsible for representing their own interest in lease negotiations with the Seneca Nation; and

(2) nothing in this subchapter shall be construed to prevent the lessees from collectively negotiating with the Seneca Nation regarding such lessees, whether through informal groups or as delegations formally sanctioned by either the State or local governments.

25 U.S.C. § 1774c(b).

Nothing in this provision gives lessee the "right" to negotiate new or different lease terms with the Nation. Nor does it give the lessees any cause of action to enforce any such "rights."

In short, Plaintiffs cannot provide any federal statutory or constitutional basis for this asserted "right to negotiate" directly with the Nation. They therefore cannot allege a claim for relief under § 1983. *Fonte v. Board of Managers*, 848 F.2d 24, 25 (2d Cir.1988); *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir.1987).

**B.** *Interference with property interests*

■ Plaintiffs have also asserted, in their submissions to this court and on oral argument, that SILA engaged in a course of conduct which has interfered with or jeopardized their interests in the continued occupancy of their homes and businesses, as well as the continued ownership of improvements on their leaseholds. Again, this claim is not specifically alleged in the complaint. In any event, it cannot form the basis for relief against SILA, the City, or the individual Defendants. The record is clear that if such interests have been impaired or jeopardized, it is because Plaintiffs have not signed new leases with the Nation. The Nation, as the owner of the real estate, of course has the absolute right to lease only on the terms offered—i.e. the 40/40 lease. Only if Plaintiffs fail to agree with the Nation will their interests in their leasehold improvements or occupancy of the premises be jeopardized. Since the Nation is immune from suit, this court is powerless to redress any deprivation of property that might occur as a result of any lessee's *failure* to come to terms with the Nation on a new lease.

Furthermore, it is undisputed that the Nation never denied Plaintiffs the opportunity to accept the 40/40 lease. As evidenced by affidavits and exhibits submitted by Defendants in support of this motion, the vast majority of lessees (96% of City lessees) have in fact entered new 40/40 leases with the Nation as of December 20, 1991 (Items 104,

105). At least for that majority, deprivation of their leasehold interests has become a moot issue.

### C. *Conspiracy to compel lessees to accept the 40/40 lease*

Plaintiffs argue that the Nation and SILA have conspired to compel the lessees to accept the 40/40 lease.

There is no factual basis for this argument. The record is clear that lessees were free to accept or reject the 40/40 lease. SILA never signed any lease agreement purported to accept the 40/40 lease on any lessee's behalf. The decision at all times has rested with the lessees.

Plaintiffs represent that some of them signed the 40/40 lease under extreme duress, since they risked loss of their property if they continued to refuse to do so. However, Plaintiffs have failed to explain how this "duress" was caused by anything other than operation of contract—*i.e.*, pending expiration of the 99-year leases, or how Defendants' conduct (as opposed to the Nation's) caused such duress. Furthermore, even if Plaintiffs had signed under "duress" as that term is defined in the law, it would at most provide a defense in a suit by the Nation to enforce the lease. As already stated, the Nation is not a party and the enforceability of the 40/40 lease is not before the court.

### CONCLUSION

For the reasons discussed above, it is recommended that the District Court grant Defendants' motion for summary judgment dismissing the second, third, fifth, seventh, ninth, eleventh and twelfth causes of action, and enter judgment on the complaint in favor of Defendants as a matter of law.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 30(a)(3).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 30(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 30(a)(3), or with the similar provisions of Rule 30(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.*

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiffs and the Defendants.

**So Ordered.**

DATED: Buffalo, New York

July 27, 1993