238 F.3d 1348 (Fed. Cir. 2001)
 GREGORY T. BANNER, JOHN T. BRAHANEY, MARIE A. BRAHANEY, KAREN L. EWING, ALICE M. FLUENT, JOSEPH D. FLUENT, NATHAN FRANK, JAMES R. FREANEY, CHRISTINE FREANY, CAROL K. GOERGEN, ROBERT L. JOHNSON, NANCY C. O'BRIEN, SARAH C. OWENS, RONALD W. SCHUBERT, MARJORIE L. SCHUBERT, MARIE B. SCHWAB, BETTY J. SEITZ, SUSAN D. SWIECH, JERRY A. TITUS, ELIZABETH TITUS AND THE SALAMANCA COALITION OF UNITED TAXPAYERS,PLAINTIFFS-APPELLANTS,
V.
UNITED STATES,DEFENDANT-APPELLEE.
 No. 00-5006
 U.S. Court of Appeals, Federal Circuit
 January 29, 2001
 
 Appealed from: United States Court of Federal ClaimsDavid J. Sleight, Lustig & Brown, Llp, of Buffalo, New York, argued for plaintiffs-appellants.
 Katherine Hazard, Attorney, Environment & Natural Resources Division, Appellate Section, Department of Justice, of Washington, Dc, argued for defendant-appellee. On the brief were Lois J. Schiffer, Assistant Attorney General; Kathryn E. Kovacs, and John A. Bryson, Attorneys.
 Before Rader, Bryson, and Gajarsa, Circuit Judges.
 Gajarsa, Circuit Judge.
 
 DECISION
 
 1
 The appellants in this case are individuals who once leased portions of the Allegany Reservation from the Seneca Nation of Indians ("SNI") in the western part of the State of New York. The appellants argue that the enactment of a federal statute, the Seneca Nation Land Claims Settlement Act of 1990, 25 U.S.C. 1774 (1994 & Supp. IV 2000) ("Act of 1990"), constitutes a taking of certain property interests in violation of the Takings Clause of the Fifth Amendment. The Court of Federal Claims dismissed appellants' claims on cross-motions for summary judgment. Banner v. United States, 44 Fed. Cl. 568, 577 (1999). Because no compensable property interest was taken, we affirm the decision of the Court of Federal Claims.
 
 I. BACKGROUND
 A. Factual Background
 
 2
 The SNI is a sovereign Native American tribe who presently reside on two separate land parcels. One is the Cattaraugus Reservation; the other is the Allegany Reservation. The latter is located near the city of Salamanca, in the western part of the State of New York. See Banner, 44 Fed. Cl. at 570. The Allegany Reservation, comprising 30,469 acres, is approximately forty miles long, one mile wide, and tracks the course of the Allegany River.
 
 
 3
 The SNI is one of the Six Nations of the Iroquois Confederacy ("Iroquois Confederacy"). The Iroquois Confederacy, or Haudenosaunee, is believed to have been formed in the fifteenth century when the legendary Hiawatha and the Great Peacemaker united the warring eastern Native American tribes. Prior to European colonization, the Iroquois Confederacy exercised active dominion over nearly thirty-five million acres, most of what is now the states of New York and Pennsylvania, and was considered the most powerful peacekeeping force of Native Americans east of the Mississippi River.
 
 
 4
 The land erosion of the Iroquois Confederacy started with the French and Indian War and culminated with the Revolutionary War. By the end of the Revolutionary War, individual member nations of the Iroquois Confederacy had lost most of their aboriginal land to European settlers. In October 1784, under the authority of the Articles of Confederation, the United States and the Iroquois Confederacy entered into the Treaty of Fort Stanwix, 7 Stat. 15. This treaty secured peace between the United States and certain members of the Iroquois Confederacy, and guaranteed their land holdings in exchange for their relinquishing claim to certain western territory. In 1790, at the urging of President George Washington, the United States Congress passed the first Indian Trade and Intercourse Act, 1 Stat. 137, which required federal approval of all land transactions with Native American tribes. In 1794, the United States and the Iroquois Confederacy entered into the Treaty of Canandaigua, or the Pickering Treaty, 7 Stat. 44.
 
 
 5
 This treaty, like the Treaty of Fort Stanwix, recognized the land rights of certain members of the Iroquois Confederacy, including the SNI, and was one of the first federal treaties executed between the United States and any Native American tribe under the authority of the United States Constitution. Specifically, the Treaty of Canandaigua set the boundary of the land of the SNI consisting of much of the western part of the State of New York; it was bounded by Lake Ontario just west of modern-day Rochester, west to the Canadian border, south along the Niagara River through modern-day Buffalo, southwest along Lake Erie to the Pennsylvania border, east to the Genesee River, and north through modern-day Geneseo back to Lake Ontario.[1]
 
 
 6
 The early 1800s saw the growth of major New York cities such as Buffalo, and the development of the State of New York canal system, linking Lakes Erie and Ontario to the Hudson River. Consequently, the State of New York and white settlers continued to attempt to displace the Iroquois from populated areas to lands west of the Mississippi. In 1838, certain Iroquois chiefs entered into a treaty that provided for the sale of Iroquois lands and the withdrawal of the Iroquois Confederacy to land in Kansas. See Buffalo Creek Treaty of 1838, 7 Stat. 551. However, it was widely believed that the chiefs entered into the treaty only after accepting bribes from land developers, and misappropriating treaty annuities. See, e.g., Robert Porter, Strengthening Tribal Sovereignty, 28 Colum. Hum. Rts. L. Rev. 235, 246 (1997). Negative reaction to the circumstances surrounding the 1838 treaty caused a revolution within the SNI, and led to a subsequent "compromise" treaty. See Buffalo Creek Treaty of 1842, 7 Stat. 550. Under the 1842 treaty, the Iroquois were displaced from areas south of Buffalo, but among other things, the SNI retained ownership of the Allegany and Cattaraugus Reservations.
 
 
 7
 Throughout the mid-1800s, white settlers began to settle in a certain area of the Allegany Reservation, located at the junction of three major inter-continental railroads. This junction and settlement became what is now known as the city of Salamanca in the County of Cattaraugus in the State of New York.
 
 
 8
 Early settlers entered into property leases with the SNI to remain on the land. Prior to 1875, however, a New York state court invalidated the leases because the SNI, a Native American tribe, did not have congressional authority to lease land. Banner, 44 Fed. Cl. at 570. Congress remedied that legal deficiency by adopting the Act of February 19, 1875, 18 Stat. 330 ("Act of 1875"). The Act of 1875, among other things, ratified then-existing leases and established that they would be valid until February 19, 1880. Id. The Act of 1875 also provided that the leases were "renewable for periods not exceeding twelve years . . . on such conditions as may be agreed upon." Id. If the parties could not agree on lease renewal terms, the Act of 1875 provided that "referees" of the SNI, the leaseholder, and a third person would determine the terms. Id. The determination of the "referees" was to be "final and binding" on the parties. Id.
 
 
 9
 When the leases expired in 1880, the SNI renewed them for twelve years in accordance with the Act of 1875. Banner, 44 Fed. Cl. at 570. With these leases set to again expire on February 19, 1892, Congress unilaterally extended the renewal period of the leases to 99 years in the Act of September 30, 1891, 26 Stat. 588 ("Act of 1890"). Accordingly, the SNI again renewed the leases of approximately 3,000 individuals for the 99-year term, set to expire on February 19, 1991. Id. The average rent on these leases was a nominal amount, between $1 and $10 annually, and did not increase over the entire 99-year term of the leases.
 
 
 10
 In 1969, anticipating the expiration of these 99-year leases, the City of Salamanca created the Salamanca Indian Lease Authority ("SILA") to negotiate new leases with the SNI. Banner, 44 Fed. Cl. at 570. In 1987, the appellants in this case authorized SILA to negotiate on their behalf the terms of a new lease. Id. After twenty years of negotiation, SILA and the SNI reached an agreement on July 13, 1990 ("Agreement"). The Agreement provided that (1) the United States and the state of New York would pay a combined $60 million to SNI to remedy the severe value inequities of the 99-year leases, (2) the SNI would offer new leases to the then-existing lessees with a term of forty years, renewable for another forty years at fair market value ("40/40 leases"), and (3) the 40/40 leases would reserve a future determination on ownership of land improvements. Id.
 
 
 11
 Congress enacted the Act of 1990 to effectuate the Agreement, because "the future economic success of the [SNI] . . . is tied to the securing of a future lease agreement." 25 U.S.C. 1774(a)(5). The Act of 1990 provides for the payment to the SNI of $35 million from the federal government and $25 million from the State of New York, provided that the SNI both ratified the Agreement and offered the 40/40 leases to the then-existing lessees. 25 U.S.C. 1774e. Furthermore, Congress enacted the Act of 1990 because it recognized that the United States had breached its fiduciary obligation arising from "the unique trust relationship" with Native American tribes. See, e.g., County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 247, 105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985).
 
 
 12
 By entering into a system of treaties, agreements, and statutes, a unique trust relationship has been created between the United States and Native American tribes. The United States has "charged itself with moral obligations of the highest responsibility and trust," and its management of Native American affairs must be "judged by the most exacting fiduciary standard." See Seminole Nation v. United States, 316 U.S. 286, 296-97, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942). Acting as a fiduciary, the United States authorized monetary compensation to the SNI, not for gratuitous reasons, but to correct the breach of its trust responsibility when it unilaterally imposed the 99-year leases on SNI lands by the Act of 1890. Finally, the Act of 1990 provided exclusive jurisdiction to the United States District Court for the Western District of New York over "any action to contest [its] constitutionality or validity." 25 U.S.C. 1774g.
 
 B. Procedural Background
 
 13
 On November 30, 1990, shortly after the enactment of the Act of 1990, the appellants first filed suit in the Western District of New York. Counts one, eight, and ten of the complaint asserted, among other things, that the 99-year leases granted a right to renew, and that the Agreement and the Act of 1990 violated the Act of 1875 and provisions of the United States Constitution. On January 25, 1991, the District Court dismissed these counts pursuant to Federal Rule of Civil Procedure 19 because the SNI was an indispensable party, but was immune from suit. Fluent v. SILA, Civ. 90-1229A. slip op. (W.D.N.Y. Jan. 25, 1991) ("First District Court Action").
 
 
 14
 The plaintiffs appealed to the United States Court of Appeals for the Second Circuit. "Plaintiffs again argued that they possessed property rights to both renew the leases via arbitration and own the improvements on the land." Banner, 44 Fed. Cl. at 571. The Second Circuit disagreed, holding that even if the SNI was not immune, "we would affirm the district court's judgment on the ground that the renewal provisions of the 1875 Act applied only to the original renewals and do not extend to the present renewals." Fluent v. SILA, 928 F.2d 542, 546 (2d Cir. 1991). The Second Circuit reasoned that "the 1875 Act does not authorize a perpetual renewal, and without clear language to that effect, we will not construe the statute to confer such a right." Id. The case was then remanded to the District Court for further proceedings against the remaining defendants.
 
 
 15
 On remand before a magistrate, the plaintiffs argued, among other things, that (1) SILA had denied their right to negotiate with the SNI, and (2) SILA had interfered with their property rights in ownership of improvements and occupancy. Fluent v. SILA, 847 F.Supp. 1046, 1057-58 (W.D.N.Y. 1994) (adopting Fluent v. SILA, 90-CV-1229A, Magistrate Report and Recommendation, July 27, 1993) ("Second District Court Action"). The magistrate ruled that (1) there was no right to negotiate because neither the Acts of 1875, 1890, and 1990, nor the 99-year leases authorized further lease renewals; and (2) any interference with property rights was because the plaintiffs chose not to accept the 40/40 leases. Id. This ruling was based on the fact that "the Second Circuit [had] determined that no further renewals are available" under the Acts of 1875 and 1890. Id. (citing Fluent, 928 F.2d at 546). The magistrate also determined that the Act of 1990 "does not create any right to negotiate." Id. The District Court adopted these findings, and dismissed plaintiffs' remaining claims. Id. The plaintiffs did not appeal that judgment.
 
 
 16
 Some of the unsuccessful plaintiffs, nevertheless, refused to accept the 40/40 leases, and refused to vacate the land when the 99-year leases expired. On May 5, 1995, therefore, the United States brought an action in the Western District of New York on behalf of the SNI to eject these individuals. The magistrate recommended that judgment be entered for the SNI because (1) the SNI owned the land; (2) the individuals had no right to renew their leases pursuant to the prior decisions; (3) the SNI was not a necessary party to the ejectment because the United States represented their interests; and (4) the SNI had been wrongfully denied possession of their property by the defendants. United States v. Fluent, 95-CV-0356A(H), slip op. (W.D.N.Y. Feb. 18, 1997) (adopting United States v. Fluent, 95-CV-356A(H), Magistrate Report and Recommendation, July 9, 1996) ("Ejectment Action"). The District Court ordered the individuals to vacate the land between June 30, 1997 and August 29, 1997. Id. There was no appeal from the panel judgment issued in the Ejectment Action.
 
 
 17
 Instead, on November 4, 1996, the appellants filed this action in the Court of Federal Claims as a plaintiffs class action. There are two categories of plaintiffs who are now appellants: (1) the unsuccessful District Court plaintiffs that chose not to accept the 40/40 leases and were later ejected ("Ejectment Appellants"), and (2) the unsuccessful District Court plaintiffs that accepted the 40/40 leases but nevertheless contest the validity of the leases. These appellants are identified as the Salamanca Coalition of United Taxpayers ("SCOUT Appellants"). The appellants' basic legal premise was that the Act of 1990 violates the Takings and Due Process Clauses of the Fifth Amendment. On September 4, 1997, the Court of Federal Claims denied class certification. On August 11, 1999, the Court of Federal Claims dismissed the Due Process claim, and granted summary judgment for the United States on the Takings claim. Banner, 44 Fed. Cl. at 577.
 
 
 18
 First, the Court of Federal Claims dismissed the Due Process Claim for lack of jurisdiction. Id. at 573. Second, the Court of Federal Claims held that collateral estoppel bars the Ejectment Appellants because the property interest in this case is identical to the one decided in the Ejectment Action. Id. at 574-75. Third, the Court of Federal Claims held that claims by SCOUT Appellants were not ripe because they had "not now lost, and may never lose, the property rights asserted." Id. at 576. On October 7, 1999, the appellants filed a notice of appeal to this court.
 
 II. STANDARD OF REVIEW
 
 19
 We review an order granting summary judgment de novo. See Strickland v. United States, 199 F.3d 1310, 1313 (Fed. Cir. 1999). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P 56(c); Newbanks v. Cent. Gulf Lines, Inc., 64 F. Supp. 2d 1, 4 (D. Mass. 1999).
 
 III. DISCUSSION
 
 20
 The appellants contend that the Act of 1990 violates the Takings Clause of the Fifth Amendment by taking their property interests in (1) the right to renew or negotiate their leases with SNI, and (2) the right to own the improvements on their leased land.[2] The appellants also maintain that the Court of Federal Claims improperly applied the doctrine of collateral estoppel to bar their takings claims.
 
 A. Right to Renew or Negotiate Leases
 
 21
 The doctrine of collateral estoppel, or issue preclusion, serves to bar the revisiting of issues that have already been litigated by the same parties or their privies based on the same cause of action. See Jet, Inc. v. Sewage Aeration Sys., 223 F.3d 1360, 1365-66 (Fed. Cir. 2000). Collateral estoppel requires four factors: (1) the issues are identical to those in a prior proceeding, (2) the issues were actually litigated, (3) the determination of the issues was necessary to the resulting judgment, and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues. Id.
 
 
 22
 In this case, the Court of Federal Claims ruled that the Ejectment Action had already determined that the Ejectment Appellants did not possess compensable property interests in the land or the improvements. Banner, 44 Fed. Cl. at 575. The Court of Federal Claims noted that it was "plaintiffs' fifth attempt to establish property rights" in this case. Id. at 574. The Court of Federal Claims held that this issue was barred by the doctrine of collateral estoppel because the issue had already been litigated, the parties were fully represented, and both the Ejectment Action and the Second District Court Action treated the Second Circuit decision as binding precedent. Id. at 575.
 
 
 23
 The appellants now argue that the Court of Federal Claims improperly applied collateral estoppel. The appellants argue that they never had a full and fair opportunity to litigate the issue and that it has "never been actually litigated in any forum." The appellants assert that the Second District Court Action and the Ejectment Action relied, without examination, on the holding of the Second Circuit. However, it cannot be contested that the first three requirements for collateral estoppel are met. Despite appellants' assertion to the contrary, the issue was "actually litigated" before the Second Circuit because it was properly raised by the pleadings, was submitted for determination, and was determined. See Restatement (Second) of Judgments 27 comment d (1980).
 
 
 24
 The appellants also had a "full and fair opportunity to litigate the issues." See Jet, 223 F.3d at 1366. The Court of Federal Claims briefly discussed this fourth factor. See Banner, 44 Fed. Cl. at 575. It reasoned that because the appellants were "fully represented" and "had a strong interest in strenuously arguing the existence of property rights," they were given a "full and fair opportunity to argue the merits of that issue." Id. This is only part of the inquiry.
 
 
 25
 In determining whether a party has had a "full and fair" opportunity to litigate an issue, a court should look at (1) whether there were significant procedural limitations in the prior proceeding, (2) whether the party had an incentive to litigate fully the issue, and (3) whether effective litigation was limited by the nature or relationship of the parties. See Sil-Flo v. SFHC, Inc., 917 F.2d 1507, 1521 (10th Cir. 1990) (citing 18 C. Wright & A. Miller 4423 at 216-226 (1981)). As recognized by the Court of Federal Claims, there can be no doubt that the appellants were "fully represented" and "had a strong interest" in this issue during the Second District Court Action and the Ejectment Action. See Banner, 44 Fed. Cl. at 575. However, in holding that the appellants have no property interest in renewing their leases, it is true that the Second District Court Action and the Ejectment Action relied on the holding of the Second Circuit. See Fluent, 928 F.2d at 546-47.
 
 
 26
 Therefore, this court must determine whether the appellants had a full and fair opportunity to litigate this issue during the Second Circuit decision. First, the appellants raised this issue in the pleadings before the First District Court Action. On appeal, the Second Circuit considered the issue, holding that it "would affirm the district court's judgment on the ground that the renewal provisions of the 1875 Act applied only to the original renewals and do not extend to the present renewals." Fluent, 928 F.2d at 546. It is important to note that this was a legal decision, interpreting the 1875 Act, and affirming the motion to dismiss. The mere disagreement with a legal ruling does not mean that a party has been denied a "full and fair" opportunity to litigate. See Sil-Flo, 917 F.2d at 1521. Appellants' argument would lead to the absurd result of precluding the use of collateral estoppel whenever the prior litigation originated from dismissal of a cause of action based upon a statutory interpretation.
 
 
 27
 The fact that the Second Circuit decided this issue as an alternative ground not addressed by the court in the First District Court Action does not detract from the preclusive effect of its decision. An appellate court "may affirm the district court on a ground not selected by the district judge so long as the record fairly supports such an alternative disposition of the issue." See, e.g, Hydronautics v. Filmtec Corp., 204 F.3d 880, 887 (9th Cir. 2000). When an appellate court affirms a judgment for two separate reasons, both appellate determinations are conclusive. Cf. Restatement (Second) of Judgments 27 cmt. o. Therefore, when the Second Circuit interpreted the Act of 1875, it eliminated the legal underpinnings of appellants' cause of action by determining that there was no legal basis for the claim. Thus, this court holds that the appellants had a full and fair opportunity to litigate this issue prior to the decision of the Second Circuit.
 
 
 28
 This court further holds, as did the Court of Federal Claims, that the decision of the Ejectment Action must also be given preclusive effect pursuant to the doctrine of collateral estoppel. As recognized by the Court of Federal Claims, this issue was briefed, argued, and actually litigated during the Ejectment Action. See Banner, 44 Fed. Cl. at 575. The fact that the decision of the Ejectment Action was based on the decision of the Second Circuit does not prevent its judgment from having preclusive effect as to the Ejectment Appellants. The Ejectment Appellants chose not to appeal the decision of the Ejectment Action to the Second Circuit. Although we cannot divine what the appellate tribunal may have concluded upon appeal of the lower court judgment, the existence of highly damaging precedent is not the kind of procedural limitation that prevents a party from having a "full and fair" opportunity to litigate an issue. Collateral estoppel requires that a party have had an opportunity to appeal a judgment as a procedural matter. It does not, however, require that the party have had reasonably fair prospects of winning on appeal. For these reasons, the decisions of the Second Circuit and the Ejectment Action must be given preclusive effect pursuant to the doctrine of collateral estoppel.
 
 
 29
 The Second Circuit held that neither the Act of 1875 nor the 99-year leases themselves granted any further right to negotiate a renewal. See Fluent, 928 F.2d at 546-47. The court in the Second District Court Action agreed. Fluent, 847 F.Supp. at 1057-58. Finally, the court in the Ejectment Action held that "the individual leaseholders have no constitutional, statutory or contractual rights to negotiate renewal of their leases for additional 99-year terms." See Fluent, 95-CV-03561(H), slip op. (W.D.N.Y. Feb. 18, 1997) (adopting Fluent, 95-CV-356A(H), Magistrate Report and Recommendation, July 9, 1996). The appellants are now bound by the prior determinations of the Second Circuit and the court in the Ejectment Action.
 
 
 30
 Therefore, the appellants do not possess any compensable property interest of the right to renew or negotiate their leases with the SNI. See Banner, 44 Fed. Cl. at 575. Without a property interest, there can be no taking within the meaning of the Fifth Amendment. Because the decision of the Second Circuit applies also to the SCOUT Appellants, this court need not address the issue of ripeness.
 
 
 31
 B. Right to Own Improvements to the Leased Land
 
 
 32
 The appellants also argue that they possess a property interest in the improvements to the leased land. The appellants argue in their brief that "by the plain language of the leases and the Acts of 1875 and 1890, it was clearly expressed and understood that the lessees had built and paid for the improvements on the land and that they owned those improvements." The appellants point to language in the Act of 1875 that states, "the persons who may be at such time the owner or owners of improvements erected upon such lands, shall be entitled to such renewed leases." However, the appellants admitted at oral argument that there is no such "express" language in the 99-year leases.
 
 
 33
 Under the general law of improvements, it is well settled that improvements to realty are considered part of the real property; ownership of the improvements follows title to the land. See, e.g., In re Chicago, Rock Island & Pac. R.R. Co., 753 F.2d 56, 58 (7th Cir. 1985); United States v. Certain Prop. 306 F.2d 439, 450 (2d Cir. 1962) ("fixtures, even though annexed by the tenant, are distinctively realty and therefore become the property of the landlord"); Jackson Tanker Corp. v. Hartz Mountain Indus., Inc., 69 B.R. 850, 856 (Bankr. S.D.N.Y. 1987); Tiffany, Real Property, 231, pp. 535-36 (1912). "On termination of the lease, permanent improvements, including buildings, are considered a landlord's property unless a lease provision provides otherwise." Nat'l Wood, 1986 WL 12761, *3 (E.D. Pa. 1986) (citing Restatement (Second) of Property 12.2(4) (1977)).
 
 
 34
 Therefore, that the appellants may have actually owned the improvements while subject to the 99-year lease is irrelevant. When the 99-year leases expired on February 19, 1991, all improvements, including buildings, reverted to the SNI.
 
 
 35
 Consequently, neither the Ejectment Appellants nor the SCOUT Appellants possess any compensable property interest in the improvements to the leased land.[3]
 
 IV.
 CONCLUSION
 
 36
 The judgment of the Court of Federal Claims is affirmed.
 
 
 37
 AFFIRMED.
 
 COSTS
 
 38
 Costs are awarded to the Defendant-Appellee.
 
 
 
 Notes:
 
 
 [1]
 Under the Treaty of Canandaigua, the land of the SNI consisted of modern- day Chautauqua, Cattaraugus, Erie, Niagara, Orleans, and Wyoming Counties, most of modern- day Allegany and Genesee Counties, and portions of modern- day Monroe and Livingston Counties.
 
 
 [2]
 It is important to emphasize that the Act of 1990 specifically disavows the role of the United States in approving any lease. "The United States shall not serve in a capacity to approve leases of the [SNI]." 25 U.S.C. 1774c(c)(1). The Act of 1990 makes clear that the SNI is "solely responsible for negotiation of the leases . . . and approval of any such lease by the United States is not required." 25 U.S.C. 1774c(a).
 
 
 [3]
 This court holds only that the ownership interest of improvements under the 99- year leases reverted to the SNI at the expiration of those leases. This court recognizes that the 40/40 leases do not determine the ownership of improvements, but rather reserve the parties' rights to decide that issue. The Ejectment Defendants chose not to enter into the 40/40 leases, and have given up any possible property interest in the improvements. While recognizing above the general rule of improvements, nothing in this opinion precludes the SNI from granting the SCOUT Appellants ownership interests in the improvements, pursuant to the 40/40 leases.