**SHELL PETROLEUM, INC., and Subsidiary Corporations, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 02–5037.

United States Court of Appeals, Federal Circuit.

Feb. 13, 2003.

Alan I. Horowitz, Miller & Chevalier Chartered, of Washington, DC, argued for plaintiff-appellant. Of counsel on the brief were Charles W. Hall, Fulbright & Jaworski, L.L.P., of Houston, Texas; and Kenneth C. Gobetz, Wichler & Gobetz, P.C., of Suffern, New York. Of counsel was Nancy T. Bowen, Fulbright & Jaworski, L.L.P., of Houston, Texas.

Steven W. Parks, Attorney, Tax Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Eileen J. O'Connor, Assistant Attorney General; and Richard Farber, Attorney.

Before NEWMAN, RADER, and PROST, Circuit Judges.

Opinion of the court filed by Circuit Judge PROST. Opinion concurring-in-part, dissenting-in-part filed by Circuit Judge PAULINE NEWMAN.

PROST, Circuit Judge.

Appellants, Shell Petroleum, Inc., and subsidiary corporations ("Shell"), appeal the decision of the United States Court of Federal Claims granting summary judgment to the United States. The court held that Shell was not entitled to a tax refund for calendar years 1988 and 1989 under the Crude Oil Windfall Profits Tax Act ("COWPTA"), Pub.L. No. 96–223, 94 Stat. 229 (1980) (codified in scattered sections of 7, 19, 26, and 42 U.S.C.) (repealed in part 1988), based on a tax credit provided in 26 U.S.C. § 29 (2000) for "oil produced from tar sands" through wells drilled between January 1, 1980, and December 31, 1992. Because we conclude that Shell is precluded from disputing that hydrocarbons produced by enhanced recovery techniques in use prior to April 2, 1980, are crude oil as opposed to tar sand oil under § 29,[1] and because there is an absence of evidence that Shell recovered hydrocarbons by any means other than enhanced recovery techniques available in 1980, we affirm.

## BACKGROUND

Crude oil is generally extracted through wells from underground reservoir formations of sand or rock containing tiny pore spaces permeated with oil. To be recoverable, the oil must flow through the pore spaces to a well. The extremely viscous hydrocarbons at issue here, however, cannot flow through to a well unless their viscosity is reduced. Enhanced recovery techniques[2] recover such oil by reducing the viscosity of the oil through the application of heat, steam or other substances.

For calendar years 1983 and 1984, Shell filed amended tax returns claiming that oil produced from one of its eight reservoirs at issue in this appeal was tar sand oil and it was therefore entitled to a tax credit under § 29. Shell recovered the oil using tertiary recovery methods that were well established and widely accepted in the petroleum industry by 1980. These methods were steam soak, begun in 1963, and steam flood, begun in 1971. The tax credits were denied and Shell timely filed suit in the United States District Court for the District of Delaware, which entered judgment for the United States. *Shell Petrol., Inc. v. United States*, 996 F.Supp. 361 (D.Del. 1997). Shell appealed to the Third Circuit.

The Third Circuit's resolution of the appeal turned on the proper definition of "oil

---

1. "Tar sand oil" denotes "oil produced from tar sands."

2. "Tertiary recovery methods," "tertiary enhanced recovery methods," and "enhanced recovery techniques" are the same. *Shell Petrol., Inc. v. United States*, 50 Fed. Cl. 524, 527 n. 5 (2001).

produced from tar sands," which COWPTA did not define. *Shell Petrol., Inc. v. United States,* 182 F.3d 212 (3rd Cir.1999) ("*Shell I* "). Shell argued the definition of "tar sands" should be based on the "viscosity standard" or "quantitative standard" allegedly commonly accepted by the petroleum industry in 1980. *Id.* The government argued that the court should adopt the definition contained in Department of Energy Ruling 1976–4, 10 C.F.R. ch. II Rulings 371, 372 (1980) ("DOE ruling" or "DOE definition"). *Shell I,* 182 F.3d at 214. That definition of "tar sands" reads as follows:

> The several rock types that contain an extremely viscous hydrocarbon which is not recoverable in its natural state by conventional oil well production methods including *currently used enhanced recovery techniques.* The hydrocarbon-bearing rocks are variously known as bitumen-rocks, oil impregnated rocks, oil sands, and rock asphalt.

Synthetic Fuels Processed From Oil Shale, and Coal, 41 Fed.Reg. 25,886 (June 26, 1976) (emphasis added).[3]

After examining the statutory language, structure, legislative history and purposes of COWPTA, the Third Circuit concluded that COWPTA defines oil produced using enhanced extraction techniques available when the § 29 credit was enacted as crude oil, which Congress clearly distinguished from tar sand oil. *Shell I,* 182 F.3d at 217, 221–22. Based on this determination, the Third Circuit held that the definition of "tar sands" most compatible with congressional intent was found in the DOE ruling. *Id.* at 221. The Third Circuit affirmed the denial of the tax credits because Shell did not contest the district court's finding that its oil was produced using tertiary recovery methods widely available in 1980. *Id.* at 223. Therefore, the Third Circuit concluded that Shell's oil was crude oil and could not be tar sand oil warranting tax credits under § 29. *Id.* at 216, 221.

At issue in this case are eight reservoirs containing extremely viscous hydrocarbons from which Shell produced oil during calendar years 1988 and 1989 using enhanced recovery techniques (cyclic steam injection and/or steam drive injection). Shell's tax refund action is based on the same § 29 tax credit that was at issue in *Shell I.* The parties agree that the DOE definition of "tar sands" is controlling in this case and that the phrase "currently used" in that definition means in use on or before April 2, 1980, the date of the enactment of COWPTA. The issue presented to the Court of Federal Claims was the applicability of the DOE definition of "tar sands" to the oil produced by Shell at its eight reservoirs.

Before the court, Shell filed a motion for partial summary judgment with respect to two of the reservoirs contending that the relevant facts demonstrated beyond dispute that the production of oil from these two reservoirs qualified for the § 29 credit. The government subsequently filed a motion for summary judgment contending that, as a matter of law, the tax credit must be denied with respect to all of the subject reservoirs.

The Court of Federal Claims held that Shell was estopped by the Third Circuit's decision in *Shell I* from disputing that hydrocarbons produced by enhanced recovery techniques in use prior to April 2, 1980, are crude oil and not oil produced from tar sands for purposes of the § 29 tax credit. The court further concluded

---

**3.** The DOE ruling was issued by the DOE's predecessor, the Federal Energy Agency. By the time COWPTA was enacted, however, the ruling was redesignated a DOE ruling in the Code of Federal Regulations. *Shell I,* 182 F.3d at 214 n. 3. The Court of Federal Claims and the parties in the instant case refer to this ruling as the "FEA Ruling."

that Shell failed to raise a genuine issue of material fact with regard to whether Shell used production methods to extract hydrocarbons other than by means of recovery methods that were in commercial use prior to April 2, 1980. The court granted summary judgment in favor of the government after concluding that Shell's oil was not oil produced from tar sands under § 29 because the oil was produced using steam assisted recovery methods that were in commercial use prior to April 2, 1980.[4] The court also denied Shell's motion for partial summary judgment and ordered dismissal of Shell's complaint.

Shell filed a timely appeal and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). On appeal, Shell challenges the application of issue preclusion, the grant of summary judgment to the government, and the denial of its partial summary judgment motion.

## DISCUSSION

### I.

 We review a trial court's application of issue preclusion, also known as collateral estoppel, *de novo*. *Dureiko v. United States*, 209 F.3d 1345, 1355 (Fed. Cir.2000). Under the doctrine of issue preclusion, "a judgment on the merits in a first suit precludes relitigation in a second suit of issues actually litigated and determined in the first suit." *In re Freeman*, 30 F.3d 1459, 1465 (Fed.Cir.1994) (citations omitted). Issue preclusion is generally appropriate if: (1) an issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) the resolution of the issue was essential to a final judgment in the first action; and (4) the party defending against issue preclusion had a full and fair opportunity to litigate the issue in the first action. *Id.*;

*Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1365–66 (Fed.Cir.2000).

 On appeal, Shell argues that the court erred in ruling that *Shell I* precludes it from contesting the government's legal interpretation and proposed application of the DOE definition of "tar sands." According to Shell, the court applied an overly expansive view of issue preclusion thereby depriving it of the opportunity to litigate many issues for the first time. Because in *Shell I* it accepted the government's position that it was jurisdictionally barred from arguing that its production met the DOE definition, Shell maintains that *Shell I* decided no more than which of two proffered definitions of "tar sands" to adopt as governing the § 29 tax credit. Thus, according to Shell, any determinations by the Third Circuit that went beyond the selection of the DOE definition were not necessary to the outcome of the litigation.

The government counters that the Court of Federal Claims correctly concluded that all the requirements of issue preclusion were met. Thus, the government maintains that Shell is estopped from relitigating the issue of whether hydrocarbons produced by enhanced recovery techniques in use prior to April 2, 1980, are crude oil and not oil produced from tar sands. We agree.

The Court of Federal Claims considered the first two requirements of issue preclusion together. These are whether the issue the government seeks to estop Shell from relitigating was raised and litigated in *Shell I*. Shell's limited view of collateral estoppel would require that only the Third Circuit's adoption of the DOE definition of "tar sands" is binding on this court, but

---

4. The court granted summary judgment in favor of the government with respect to one of the eight reservoirs because Shell did not reveal the production method for that reservoir.

not the analysis that formed the basis for its adoption of this definition.

We see no grounds, however, for such parsing of the Third Circuit's conclusions leading to its adoption of the DOE ruling as the proper definition of "tar sands." The question resolved by the Third Circuit was whether the oil Shell produced using enhanced recovery techniques available in 1980 qualified for a § 29 tax credit, a determination that turned on the proper definition of "oil produced from tar sands." *Shell I*, 182 F.3d at 214. The Third Circuit concluded that oil produced by "enhanced recovery techniques" available in 1980 is crude oil and cannot be "oil produced from tar sands." *Id.* at 221–22. This issue was raised and litigated by Shell. *See Banner v. United States*, 238 F.3d 1348, 1354 (Fed.Cir.2001) (stating that an issue was "actually litigated" because it was properly raised by the pleadings, submitted for determination, and determined (citing *Restatement (Second) of Judgments* § 27 cmt. d (1980))); *Harris Trust & Sav. Bank v. Ellis*, 810 F.2d 700, 705 (7th Cir.1987) (stating that "[w]hen one party introduces evidence on a dispositive issue of fact, and an adverse party with opportunity and motive to contest the presentation chooses not to, the ensuing finding is entitled to the same respect as one litigated to the hilt"). Although Shell did not contest that oil produced using tertiary recovery methods available in 1980 is crude oil, it argued that the same oil could also be classified as tar sand oil. *Shell I*, 182 F.3d at 221–22; *Shell Petrol.*, 50 Fed.Cl. at 533, nn. 10, 11. Based on its interpretation of COWPTA, the Third Circuit rejected these arguments because "Congress clearly distinguished tar sand oil from crude oil." *Shell I*, 182 F.3d at

221. Furthermore, the Third Circuit specifically rejected Shell's definition of "tar sands" because it would classify oil produced from enhanced extraction techniques available in 1980 as tar sand oil. *Id.*

The next issue preclusion requirement is that the resolution of the issue was "necessary to the judgment." In this regard, it is clear that the Third Circuit adopted the DOE definition of "tar sands" precisely because it concluded that hydrocarbons that are produced by means of conventional oil well production methods, including enhanced recovery techniques in use on or before April 2, 1980, are "crude oil" and cannot be "oil produced from tar sands" for purposes of the § 29 tax credit. *See Mother's Rest., Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1571 (Fed.Cir.1983) (stating that the purpose of the "necessary to the judgment" requirement is to prevent the incidental or collateral determination of a nonessential issue from precluding reconsideration of that issue in later litigation). Thus, the court's determination that oil produced using "currently used enhanced recovery techniques" is crude oil and not tar sand oil was indeed necessary to the resulting judgment.[5]

■ The last issue preclusion requirement is that Shell had a "full and fair opportunity to litigate" the issue in the first action. The relevant factors to consider in determining whether this requirement has been satisfied are: (1) whether there were significant procedural limitations in the prior proceeding; (2) whether the party had an incentive to fully litigate the issue; and (3) whether effective litigation was limited by the nature or relationship of the parties. *Banner*, 238 F.3d at

5. Although the ultimate result of the judgment was that Shell was not entitled to the § 29 tax credit, that result necessarily followed because Shell did not contest that the oil at issue in *Shell I* was oil produced using tertiary recovery methods. *Shell I*, 182 F.3d at 223.

1354. We conclude that, based on this record, the "full and fair opportunity to litigate" requirement of issue preclusion is met. Shell was fully represented by counsel during *Shell I*, it had a monetary incentive to fully litigate the issue, and effective litigation was not limited in any way. Therefore, we agree with the Court of Federal Claims that Shell is precluded from re-litigating the issue of whether hydrocarbons produced by means of enhanced recovery techniques in use prior to April 2, 1980, are "crude oil" and not "oil produced from tar sands" for purposes of the § 29 tax credit.

## II.

 Shell further argues on appeal that, notwithstanding whether issue preclusion applies, the Court of Federal Claims nonetheless erred in granting summary judgment to the government because a factual dispute exists as to whether the steam assisted oil recovery methods used at the subject reservoirs constitute "currently used enhanced recovery techniques" as of April 2, 1980, under the DOE definition of "tar sands." We review the trial court's grant of a motion for summary judgment without deference. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1330 (Fed. Cir.2001). Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Court of Federal Claims Rule 56(c).

The Court of Federal Claims determined that "enhanced recovery technique" connotes a production method in and of itself, as opposed to an incremental development or improvement in pre-existing methods of production. Moreover, it accepted the government's definition of a "production method" as a method that moves hydrocarbons in a reservoir to a well bore so they can be lifted to the surface. The court, therefore, granted summary judgment for the government because it concluded that all of the technological improvements demonstrated by Shell are ancillary aides that may make cyclic steam or steam drive injection production processes more efficient and cost effective, but do not actually move hydrocarbons from the reservoir to the surface.

Shell argues that the use of new technology not available in 1980, in conjunction with, and that significantly improves the capabilities of, an existing recovery method to produce previously unrecoverable hydrocarbons can amount to a new recovery "technique" within the meaning of the DOE definition. In support, Shell contends that a determination that the use of steam automatically disqualifies it from the § 29 tax credit is inconsistent with the text of § 29(b)(5), which provides that a § 29 tax credit for producing oil from tar sands must be reduced by any credit allowed under 26 U.S.C. § 43 with respect to the same project. Section 43 provides a tax credit for costs expended in developing qualified enhanced oil recovery projects involving the application of a tertiary recovery method, which includes steam injection. *See* 26 U.S.C. § 43(c)(2)(A)(i) (2000). Shell maintains that § 43 is limited to enhanced oil recovery projects, and the recovery methods identified in § 43(c)(2) are not used to recover shale oil, the only other "oil" listed in § 29 as qualifying for the tax credit besides tar sand oil. Therefore, in Shell's view, § 29(b)(5) would be superfluous if it were not possible for a production using steam injection to qualify for a § 29 credit.

Shell also argues that although the production technique it used at the eight subject reservoirs included the injection of steam, the technology critical to the production of the hydrocarbons was very different from the technology widely avail-

able as of April 2, 1980. In support, Shell asserts that its technological advances include a new way of injecting steam,[6] the "limited entry completions on steam injectors,"[7] and advanced modeling tools to identify the location of oil, determine where to place the wells and how much steam to introduce. In addition, Shell allegedly developed more sophisticated surveillance tools that allowed it to better monitor the movement of oil and heat within the reservoir and thereby change the operation parameters to optimize production. Shell also made use of advances in drilling, facilities design, and well completion methods.[8]

Lastly, Shell specifically argues that oil produced from two of the subject reservoirs in 1988 and 1989 is "oil produced from tar sands" because the oil could not be economically produced using enhanced recovery techniques in use as of April 2, 1980. Shell alleges that it was able, presumably economically, to recover oil from these two reservoirs in 1988 and 1989 because of the enhancements it had developed by that time to its pre-April 2, 1980, recovery technology.

■ We conclude that the Court of Federal Claims correctly granted summary judgment to the government. First, in our view, the determination that a steam based recovery cannot qualify for a § 29 tax credit does not render the § 29(b)(5) provision superfluous. Rather, as the court recognized, the offset provision can operate if a taxpayer uses a steam based recovery technique in conjunction with a production technique that was new or had not been combined with a steam based recovery method before April 2, 1980, to produce tar sand oil. Furthermore, we agree with the court's conclusion that the term "recovery technique" in the DOE definition of "tar sands" connotes a production method that moves hydrocarbons in a reservoir to a well bore so they can be lifted to the ground surface. The court's interpretation of production method is supported by the June 1979 energy regulations, which describe recovery methods as methods of moving oil from the reservoir to the well bore from which the hydrocarbons may then be pumped to the surface. *See* 10 C.F.R. § 212.78(c) (1979).[9]

Contrary to Shell's assertion, therefore, its technological advancements were not necessary to the production of hydrocarbons because Shell has not demonstrated that its allegedly new technologies changed the pre-April 2, 1980, methods of moving hydrocarbons to the surface from the recovery methods available in 1980. Rather, Shell's method of moving the hydrocarbons was no different from the steam based recovery methods available in 1980, i.e., by injecting steam into the reservoir. Although Shell's technological advances may have made steam injection production more cost effective to use in 1988 and 1989 than it was in 1980, the

---

**6.** This new device for injecting steam is called a Steam Quality Utilizing Iso-kinetic Deflection, which distributes steam more efficiently and uniformly in the reservoir.

**7.** This technology allowed Shell to flood multiple oil zones simultaneously, accelerating production from individual zones and greatly enhancing the profitability of the reservoir.

**8.** The well completion methods included advances in well casing design that did not collapse at the high pressure and temperature necessary for production. Shell alleges that this advance directly assisted in the movement of hydrocarbons to the ground surface because oil will not flow through a collapsed well bore.

**9.** COWPTA defines a "tertiary recovery method" as one of the methods described in subparagraphs (1) through (9) of § 212.78(c) of the June 1979 energy regulations. *See* 26 U.S.C. § 4993(d)(1)(A) (repealed 1988).

recovery method was nonetheless in use as of April 2, 1980.

Accordingly, we do not accept Shell's argument that previously uneconomically recoverable oil at two of the subject reservoirs, which is now economical to recover due to technological improvements to a pre-April 2, 1980, recovery method qualifies as tar sand oil. Adopting Shell's position would contradict the purposes of COWPTA as interpreted by the Third Circuit. The Third Circuit found that Congress added the § 29 alternative fuel production tax credit " 'to encourage energy conservation and production of alternative energy sources.' " *Shell I*, 182 F.3d at 224 (citations omitted). In so doing, according to the Third Circuit, Congress explained that these alternative energy sources " 'typically involve new technologies' " and the information obtained from the " 'initial efforts at producing these [alternative] sources will' " benefit the entire economy. *Id.* (citations omitted). As the Third Circuit recognized, continued use of a widely available means of crude oil production is not an " 'initial effort[ ]' " that will stimulate the development of new energy technologies. *Id.* (citations omitted). Improvements to conventional recovery methods available in 1980 that make recovery more cost effective, thereby making production at certain reservoirs economically practicable, is likewise not an initial effort that will stimulate the development of new energy technologies. Therefore, even accepting Shell's factual allegations as true, Shell failed to raise a genuine issue of material fact disputing that it used production methods at any of its eight reservoirs other than by means of "currently used enhanced recovery techniques" as of April 2, 1980.

## CONCLUSION

For the foregoing reasons, Shell was properly precluded from disputing that hydrocarbons produced by means of en-

hanced recovery techniques in use prior to April 2, 1980, are "crude oil" and not "tar sand oil" under § 29. Because Shell failed to provide any facts showing that it produced hydrocarbons using enhanced recovery techniques not available on or before April 2, 1980, we also conclude that the oil produced from Shell's eight reservoirs was not "oil from tar sands" and, therefore, is not entitled to receive the § 29 tax credit. Accordingly, we affirm the grant of summary judgment to the government and affirm the denial of Shell's motion for partial summary judgment.

*AFFIRMED.*

PAULINE NEWMAN, Circuit Judge, concurring in part, dissenting in part.

I agree that Shell is collaterally estopped by the decision of the Third Circuit in *Shell Petroleum, Inc. v. United States*, 182 F.3d 212 (3d Cir.1999), from relitigating the subject matter there decided. The Third Circuit case related to tax returns for 1983 and 1984, and held that Shell was not entitled to the Section 29 tax credit for recovery from the Potter Sands reservoir. Shell accepts the definition of tar sands used by the Third Circuit, but argues that even under that definition it has established entitlement to the Section 29 tax credit, at least with respect to the two reservoirs of primary focus in this appeal. The Court of Federal Claims decided the issue on summary judgment, holding that Shell was not entitled to the Section 29 credit for any of the reservoirs. However, it cannot be decided, on either summary judgment or collateral estoppel, that the facts and procedures of 1988 and 1989 are the same as those that were before the Third Circuit for 1983 and 1984. Thus while I agree with the panel majority that Shell is estopped from disputing the applicability of the Federal Energy Agency's 1976 definition of tar sands, I do not share

the conclusion that this definition precludes Shell's argument and entitlement with respect to the technology it used in 1988 and 1989.

A

Shell states, and the record well supports, that the Coalinga–Etchegoin and the McKittrick–Tulare reservoirs meet the definition of oil from tar sands, either as defined by the Federal Energy Agency in 1976 as "extremely viscous hydrocarbon which is not recoverable in its natural state by conventional oil well production methods including currently used enhanced recovery techniques," FEA Ruling 1976–4, 41 Fed.Reg. 25,886 (June 23, 1976), or as defined by the Department of Energy in 1980 as "a hydrocarbonaceous material with a gas-free viscosity, measured at original reservoir temperature, greater than 10,000 centipoise," [10] the definition in the Combined Hydrocarbon Leasing Act of 1981, 30 U.S.C. '209, and the Energy Policy Act of 1992, 42 U.S.C. '13554.

The viscosity of the hydrocarbons in the Coalinga tar sands is reported, as measured by the government, as ranging from 125,000 cp to 600,000 cp; and the viscosity of the hydrocarbons in the McKittrick reservoir is reported as ranging from 27,000 cp to 64,750 cp. Shell recovered hydrocarbons from these reservoirs in 1988 and 1989, using methods not in general use on April 4, 1980, the date set in the Section 29 enactment. These methods are described by Shell as (1) advanced modeling tools, including the Vogel modeling method and numerical thermal simulators; (2) sophisticated surveillance methods; (3) advanced drilling and well completion methods, including advanced casing design and sand control; and (4) advanced facility design, including cogeneration and steam distribution.

The Court of Federal Claims seriously over-simplified this complex field, in denigrating these procedures as mere "advanced technology," and not "advanced techniques" as purportedly contemplated by the statute.[11] From this oversimplification the trial court concluded that if known steam procedures were adapted through new technology to recover the hydrocarbon from tar sands, the product became "crude oil" by definition, whatever its viscosity and its previous unrecoverability. This leap of logic is not in accordance with the statute and its legislative purpose, and is based on disputed findings inappropriate to summary judgment.

The statute does not state that only some brand new "technique" can qualify for the tax credit, and it is highly unlikely that Congress so contemplated, for the incentive was broad and the need was urgent. I do not here evaluate the technologic modifications and improvements made by Shell, but on the undisputed fact that before 1980 tar sands could not be economically harvested at these sites, it is clear that the question could not be summarily decided adversely to Shell. Nor was the question adequately explored by the trial court, who deemed it barred by

10. The viscosity of water is 1 centipoise (cp). The record states that most oil produced in the United States has a viscosity below 8 cp, and 98% of crude oil deposits have a viscosity lower than 1,000 cp.

11. The statute and its history use both "techniques" and "technologies." For example, the Senate Report on the tax credit legislation states that the alternative energy sources eligible for the Section 29 tax credit would "typically involve new technologies." S.Rep. No. 96–394, at 87 (1979), reprinted in 1990 U.S.C.C.A.N. 410, 496. This Report also stated that the purpose of the tax credit is to "encourage the development of these [shale and tar sand] resources by decreasing the cost of their production" through the tax credit. Id.

collateral estoppel. However, the Third Circuit did not deal with later-developed technology, and did not generate estoppel as to all steam-based extraction technology. Estoppel based on the Third Circuit decision is necessarily limited by the application of the definition of tar sands to the facts relevant to the 1983 and 1984 tax years and the Potter Sands reservoir.

Shell was not permitted to prove its proffered facts, on the ruling by the Court of Federal Claims that because Shell used previously known steam-based procedures along with new technology, there is no way that the statutory requirement can be met. Thus the court ruled that whatever the new technology and the changes and improvements used in 1988 and 1989, any procedure using steam-assisted recovery is an "enhanced recovery technique" available in 1980. On this premise the Court of Federal Claims ruled that all hydrocarbon that is successfully extracted from tar sands with steam-based procedures is "crude oil," and that since the Section 29 tax credit is unavailable for crude oil, it is unavailable for this tar sand extraction.

## B

It is not disputed that the products of the Coalinga and McKittrick reservoirs have viscosities starting at 27,000 cp. This is not crude oil by any definition. The record does not establish that the steam extraction techniques of tertiary recovery as generally used in 1980 were capable of economic recovery of the hydrocarbons in tar sands. Although the government argues that these hydrocarbons could have been recovered using those techniques, hindsight and speculation are not probative evidence, and are insufficient grounds of summary judgment.

The factual issues with respect to the later-developed technology used at Coalinga and McKittrick in 1988 and 1989 were not resolved by the Third Circuit in con-

nection with the 1983 and 1984 Potter Sands tax years. These factual issues were not before the Third Circuit, and are not barred by collateral estoppel. *See Cromwell v. Sac County*, 94 U.S. 351, 356, 24 L.Ed. 195 (1876) ("a point not in litigation in one action cannot be received as conclusively settled in any subsequent action"); *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320 (Fed.Cir. 1987) (same). These facts could not be found adversely to Shell on summary judgment. Shell is entitled to establish the differences of its 1988–89 technology from the steam-based tertiary recovery techniques in general use before April 2, 1980, as the statute contemplates, and to establish whether the hydrocarbon from these reservoirs could reasonably have been economically recovered using those techniques.

The government argues that if the hydrocarbon became economically extractable from tar sands using steam-based technology, it was no longer oil from tar sands but became crude oil. Shell complains that on this reasoning, after a producer develops an economic method of using steam to extract hydrocarbons from tar sands, the hydrocarbon loses its identity as tar sand product. Indeed, this reasoning denies the legislative premise that "the term 'crude oil' ... does not include synthetic petroleum, such as oil from shale or tar sands," set forth in S.Rep. No. 96–394, at 56 (1979), *reprinted in* 1980 U.S.C.C.A.N. at 465. *See also* H.R. Conf. Rep. No. 96–817, at 114 (1979), *reprinted in* 1980 U.S.C.C.A.N. 642, 667.

Shell states that it tried and failed to economically extract tar sand oil using the "enhanced production techniques" available using steam in 1980. The Court of Federal Claims deemed it irrelevant that the tar sands could not be extracted using procedures in use in 1980, citing the Third

Circuit's reference to "incremental tertiary oil" as not entitled to the credit. However, Shell correctly points out that the list of nine tertiary enhanced recovery techniques contained in the energy regulations, 10 C.F.R. '212.78, which include "steam drive injection" and "cyclic steam injection," permits variations on steam-based techniques to qualify for the tax credit.

It is a question of material fact as to whether the changes achieved by Shell in steam-based recovery are sufficient to satisfy the statutory purpose. That factual question could not be decided adversely to Shell on summary judgment, for Shell showed on the summary judgment record that the steam drive injection and cyclic steam injection procedures in use in 1980 were inadequate to produce more than an "uneconomic trickle" of recovery from tar sands. Shell's position required development of the evidence, and was not amenable to adverse summary judgment.

### C

The government also argues that Shell's oil from these reservoirs "poured" or "flowed," arguing that this cannot be the product of tar sands because it "exists in a liquid phase." Shell agrees that the product of tar sands exists in a liquid phase, for "viscosity is a physical property of all fluids. Solids do not have viscosity." Shell's Proposed Findings of Uncontroverted Fact. The product of tar sands is an "extremely viscous hydrocarbon," the words of the Federal Energy Agency Ruling 1976–4, as adopted by the Third Circuit. *Shell Petroleum*, 182 F.3d at 214. "Viscosity is a measure of a fluid's resistance to flow." *Shell Petroleum*, 182 F.3d at 214 n. 1. The argument concerning "flow" is not only scientifically flawed; it is irrelevant.

### D

The government further states that all tax benefit statutes must be "strictly con-

strued," and that any doubt must be resolved adversely to the taxpayer. However, that is not an accurate generalization. For example, statutes designed to provide an incentive for private investment have been required to be "construed liberally" in order to achieve their purpose. *See Xerox Corp. v. United States,* 228 Ct.Cl. 406, 656 F.2d 659, 678 (Ct.Cl.1981) (investment tax credit); *Panhandle Eastern Pipe Line v. United States,* 228 Ct.Cl. 113, 654 F.2d 35, 42 (Ct.Cl.1981) (investment tax credit).

The government also states that Shell paid windfall profits tax on this oil, arguing that Shell viewed it as crude oil and not as tar sand oil, and cannot take a contrary position in the courts. Shell responds that the dividing line between crude oil and tar sands oil has not been decided, and that the government had taken conflicting or unclear positions—as is apparent from this litigation. Shell cannot be faulted or subjected to adverse inferences for paying the tax to the extent that it may have done so.

### Summary

The Section 29 tax credit is limited to new investment, that is, to wells and facilities placed in service after 1979. It is undisputed that the purpose of Section 29 was to provide, through tax abatement, an incentive to recovery of hydrocarbons that could not be economically recovered by the procedures then available for crude oil. Although the government insists that the tar sand hydrocarbons for which Shell seeks the Section 29 credit were in fact recoverable through tertiary recovery procedures in general use in 1980, Shell proffered contrary evidence based on its actual attempts to recover tar sand hydrocarbons.

The presence of hydrocarbons in tar sands has been known for decades, without economic procedures for their extraction.

The congressional purpose of encouraging the development of this large and undeveloped resource is defeated by the ploy of classifying the oil from tar sands as "crude oil" after the technology to extract it is developed. Shell is entitled to prove that the technology it used in these tar sand reservoirs was not generally available before April 2, 1980, with due attention to economic feasibility. I respectfully dissent from this court's endorsement of the trial court's summary disposition and its premises.